**In the Matter of GRAND JURY PRO-CEEDINGS.**

**Frank J. DUFFY, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 72-1563.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 17, 1972.

Decided Jan. 16, 1973.

Rehearing Denied Feb. 12, 1973.

James W. R. Brown, Omaha, Neb., for appellant.

Sidney M. Glazer, Atty., U. S. Dept. of Justice, Washington, D. C., for appellee.

Before VAN OOSTERHOUT, Senior Circuit Judge, LAY, Circuit Judge, and DURFEE, United States Court of Claims Judge.

VAN OOSTERHOUT, Senior Circuit Judge.

This is an appeal from an order of the Federal District Court adjudging Frank J. Duffy, an attorney, guilty of civil contempt (*see* 28 U.S.C. § 1826) for his disobedience of an order requiring him to "answer responsively before the Grand Jury any and all questions relating to information furnished by informants contacted by him, who at the time of such contact were not employees of Northern Natural Gas Company [Duffy's client] or any of its wholly-owned subsidiaries, with respect to matters under inquiry by the Grand Jury and . . . to bring with him all notes, memoranda, or other record of all such contacts." Duffy's disobedience of that order is based on his claim that the demanded information constitutes "work product" procured in behalf of his corporate client and is therefore protected from compelled disclosure before the Grand Jury.[1]

The same matter has been before the Eighth Circuit once before pursuant to an appeal from an earlier similar court order issued by the Honorable Richard A. Dier, United States District Judge, District of Nebraska. The appeal was dismissed as being interlocutory. Duffy also petitioned for a writ of mandamus against Judge Dier to vacate his order. We denied the writ. We observed that the record was "silent as to what specific files, documents or memoranda the petitioner seeks to protect or the circumstances under which any such records were obtained." Duffy v. Dier, 465 F. 2d 416, 418 (8th Cir., 1972).

Since that decision, the record has been clarified as to both facts and issues. We note that, with respect to matters communicated to Duffy by his corporate client's officers and employees, the District Court held the attorney-client privilege applicable. The contempt order here involved is in no way based on Duffy's refusal to disclose such communications. Thus we do not reach the issue raised by the Government that no attorney-client privilege exists with respect to communications made to Duffy by officers and employees of his client.

Duffy disclosed to the Grand Jury the names of all persons he interviewed in his capacity as attorney for Northern Natural Gas Company, including both employees and nonemployees. A fair reading of the record suggests that all of Duffy's communications with nonemployees were undertaken as an attorney in the course of preparation for anticipated litigation in connection with alleged bribe payments made to public officials by his client and its subsidiaries. The District Court impliedly so found,[2] and the Government does not contend otherwise. It is also clear that only the content of the nonemployee communications (as opposed to their existence, time, place, or the names of those contacted) is at issue. Moreover, the record indicates that only Duffy's personal recollections and summarizing

---

1. Duffy does appear to make some claim of attorney-client privilege regarding the nonemployee communications. For the purposes of this appeal, we will assume, without so deciding that the attorney-client privilege does not apply to interviews with nonemployees.

2. The District Court states: "I am going to rule that there is an attorney-client privilege with reference to corporate employees he contacted and therefore he doesn't have to divulge what they told him. And then I am going to rule that there is no attorney-client privilege with reference to the other informants and that the work product rule probably does apply but the Government's interest is so great that it is necessary they get that information and he must divulge that information that he received from other sources other than corporate employees and answer those kind of questions and he does not have to give any information about his opinion about the results that might follow from different informants' testimony to him. In other words, his legal opinion does not have to go before the Grand Jury, but factual data that he obtained from other than corporate employees, he must disclose even though there might be a question of work product here, I think the Government's interest is such that, it is so great, that it must be disclosed."

notes and memoranda are involved. There is no suggestion that Duffy has possession of written statements prepared or signed by interviewees or verbatim quotations of their oral statements. Further, it is the interviewees' assertions of fact rather than Duffy's legal conclusions or opinions which are at issue. Nor does this case involve what the District Court characterized as an attempt to "ultimately foreclose all Grand Jury investigation." Rather, it concerns an attempt to seal the lips of only one among many possible witnesses before the Grand Jury. Finally, it should be noted that "the fact that the client is a corporation in no way affects the claim of an attorney to his 'work product' privilege." Annot., 35 A.L.R.3d 423 (1971) citing Radiant Burners, Inc. v. American Gas Assoc., 207 F.Supp. 771 (N.D.Ill.), adhered to, 209 F.Supp. 321 (1962), rev'd on other grounds, 320 F.2d 314 (7th Cir.), cert. den. 375 U.S. 929, 84 S.Ct. 330, 11 L.Ed.2d 262 (1963).

Broadly stated, the issue presented by this case is whether the work product doctrine operates to excuse an attorney from testifying before a grand jury with respect to his memoranda and recollections of conversations in anticipation of litigation with persons other than employees of his client corporation.

■ The preliminary and most difficult aspect of this issue is whether the work product doctrine has any application whatsoever to grand jury proceedings. For the reasons which follow, we hold that it does.

The most direct authority on the question is the case of In re Terkeltoub, 256 F.Supp. 683 (S.D.N.Y.1966). In that case one Fiorillo, Terkeltoub's client, had been indicted for committing perjury before a grand jury when he denied having had certain telephone conversations with one Tony Vone. After the indictment, the United States Attorney received information to the effect that Fiorillo and Terkeltoub had had a meeting with Vone during which they attempted to persuade Vone to testify at

Fiorillo's pending perjury trial that he did not have the conversations alleged in the perjury indictment. Subsequently, a grand jury came to inquire whether the alleged meeting between Fiorillo, Terkeltoub and Vone warranted a prosecution for obstruction of justice. Terkeltoub was called before the grand jury and was asked questions concerning the alleged meeting and the conversations which took place pursuant thereto. He refused to answer and the Government brought an application to compel the testimony. The district court held that Terkeltoub could not be compelled to disclose the requested information.

In the instant case, the Government seeks to distinguish *Terkeltoub* on the grounds that it was based on Fifth and Sixth Amendment considerations which are not applicable to the facts here presented. It is our belief, however, that the work product doctrine formed the predominant basis for the *Terkeltoub* decision. In its careful and revealing analysis of the interests involved, the *Terkeltoub* court states:

"On the one hand, there is the heavy weight of history and public need commanding that the grand jury's investigations be as unfettered as possible. See, e. g., United States v. Thompson, 251 U.S. 407, 413–415, 40 S.Ct. 289, 64 L.Ed. 333 (1920). And the Government comes here with the laudable purpose of guarding against suspected attacks on the integrity of the judicial process itself. Cf. Massiah v. United States, 377 U.S. 201, 207, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); Caldwell v. United States, 92 U.S.App.D.C. 355, 205 F.2d 879, 881 (1953), cert. denied, 349 U.S. 930, 75 S.Ct. 773, 99 L.Ed. 1260 (1955). On the other hand, the disclosures now demanded, touch a vital center in the administration of criminal justice, the lawyer's work in investigating and preparing the defense of a criminal charge. Appraising these interests in the circumstances now presented, the court concludes that the attorney was not only entitled, but

probably required, to withhold answers to the grand jury's questions.

"In explaining this conclusion, it bears emphasis that while the witness before us is a lawyer, the crucial interests at stake belong to the whole community. As a seasoned trial lawyer and Justice said, 'it too often is overlooked that the lawyer and the law office are indispensable parts of our administration of justice. * * * The welfare and tone of the legal profession is therefore of prime consequence to society, which would feel the consequences' of a practice impairing the lawyer's effective representation of his client. Hickman v. Taylor, supra, 329 U.S. [495] at 514–515, 67 S.Ct. [385] at 395 [91 L.Ed. 451], (Jackson, J., concurring).

*   *   *   *   *   *   .

"And so we start here with a demand that is troublesome on its face —a demand that a lawyer be forced to testify about his work in supposed defense of a client. Our problem is not solved, but it is affected, by a recognition that this sort of procedure must have at least a slightly chilling impact upon counsel for defendants in criminal cases. Again, this has nothing to do with whether lawyers for their own sakes should be treated better or worse than other people. It has to do with how the public may fare depending on the course followed with applications like the one before us. . . . At the heart of the job of 'thorough-going investigation and preparation' is the interviewing of prospective witnesses, hostile as well as friendly. And no lawyer, on any side of any case, would consider it salutary for his client that the opposition knew who was being interviewed and what was being said during such meetings. If vivid illustration were needed, it is supplied every day in this courthouse by the Government's stout resistance to discovery efforts by defendants in criminal cases. . . .

"And so we focus more closely upon the more limited issue the Government puts: Where the prosecution, presumably with reason, suspects that a witness is being tampered with, may the defense lawyer preparing for trial be compelled to report under oath the existence, time, place, and content of an interview with the witness? Without holding that there could never be an affirmative answer to this question, our conclusion is that it should be answered in the negative on the facts now before us.

"Even in civil litigation, disclosure of this kind will be compelled only in a 'rare situation' that may justify 'an exception to the policy underlying the privacy of [the attorney's] professional activities.' Hickman v. Taylor, supra, 329 U.S. at 513, 67 S.Ct. at 395. Out of abundant caution, we leave open the possibility that still more rare circumstances could justify a demand of the kind here in question. But we are not persuaded, balancing the claim of need for the testimony against the potential hurt of it, that there is any sufficient justification in this case." 256 F.Supp. at 684–686 (footnotes omitted).

*Terkeltoub* is direct and convincing authority supporting the application of the work product doctrine to grand jury proceedings and supports a reversal in the instant case. Moreover, the *Terkeltoub* court applied the work product doctrine in spite of factual allegations tending to defeat its application which were much stronger than those apparent in the instant case. In *Terkeltoub*, "[t]he testimony sought [dealt] allegedly with a conversation amounting to, or looking toward, the commission of a crime." 256 F.Supp. at 684 n. 2. In contrast, there is no credible showing in this case that Duffy in his interviews with nonemployees was engaged in the commission of any crime. The fact that the work product privilege was vigorously asserted creates no presumption that Duffy was engaged in any illegal activity.

Other than *Terkeltoub,* we have found no reported decision which squarely faces the questions presented in the instant case. Nevertheless, inferences may be drawn from analogous cases which suggest the application of the work product doctrine in Grand Jury proceedings. It is clear, for example, that a broad range of common law privileges applies to Grand Jury witnesses. "While the grand jury witness is not allowed to interpose objections to questions on the grounds of strict evidentiary rules insuring relevance or probity, he may be able to avoid answering by invoking applicable common law or statutory privileges. A refusal to answer is justified where the information sought is protected from disclosure by the husband-wife privilege, the attorney-client privilege, the physician-patient privilege, or other similar rules guarding against revelation or protecting relationships." Comment, The Witness Before a Grand Jury, 1967 Duke L.J. 97, 121 (footnotes omitted). As recently stated in In re Evans, 146 U.S.App.D.C. 310, 452 F.2d 1239, 1245 (1971), witnesses "have frequently been permitted to withhold testimony from a grand jury on the basis of a constitutional, statutory, or common law privilege." (Footnotes omitted). *See also id.* at 1245–1246 n. 23. The need for protection of Grand Jury witnesses has also been noted by the United States Supreme Court. In Blair v. United States, 250 U.S. 273, 281, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919), the Court stated that the duty of a witness to testify before a Grand Jury "is subject to mitigation in exceptional circumstances; . . . some confidential matters are shielded from considerations of policy, and perhaps in other cases for special reasons a witness may be excused from telling all that he knows." Again, in United States v. Bryan, 339 U.S. 323, 331, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950) the Court states: "Certain exemptions from attending, or, having attended, giving testimony are recognized by all courts. . . . [E]very such exemption is grounded in a substantial individual interest which has been found, through centuries of experience, to outweigh the public interest in the search for truth." Finally, in Branzburg v. Hayes, 408 U.S. 665, 688, 92 S. Ct. 2646, 2660, 33 L.Ed.2d 626 (1972), the Court once more noted an exception concerning Grand Jury testimony "for those persons protected by a constitutional, common law, or statutory privilege."

The language in the above-quoted authorities suggests an inquiry into the policies supporting the work product doctrine as well as its common law origins; if an attorney's work product is shielded pursuant to a "common-law privilege" or "from considerations of policy" then it should be protected in Grand Jury proceedings.

The background of the work product doctrine is somewhat obscure. It is clear, however, that the doctrine has arisen from the common law. McCormick states:

"The natural jealousy of the lawyer for the privacy of his file, and the court's desire to protect the effectiveness of the lawyer's work as the manager of litigation, have found expression, not only as we have seen in the evidential privilege for confidential lawyer-client communications, but in rules and practices about the various forms of pretrial discovery. Thus, under the chancery practice of discovery, the adversary was not required to disclose, apart from his own testimony, the evidence which he would use, or the names of the witnesses he would call in support of his own case. The same restriction has often been embodied in, or read into, the statutory discovery-systems." C. McCormick, Law of Evidence 201–02 (2d ed. 1972) (footnotes omitted).

As Wigmore points out, the attorney-client privilege and the work product doctrine spring from the same common law origin. *See* 8 Wigmore, Evidence § 2318 (McNaughton rev. 1961). The general common law privilege was very broad indeed. "At common law

. . ., a document which did not come into existence as a communication to the attorney (and which therefore fell without the present [attorney-client] privilege) would nevertheless, in the hands of the party's attorney, have been exempt from production. . . . " *Id.* Through modern *exceptions to the common law rule* such a document "is today subject to discovery under a bill of discovery in equity or under the modern statutes. . . . [E]ven under the modern statutes, [however] the doctrine of Hickman v. Taylor [, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947),] exempts from discovery certain 'work product' of the attorney, including records of communications to him from third persons not within the attorney-client privilege." *Id.* (footnotes omitted). Tracing the subsequent development of the common law, Wigmore notes that, in England, the privilege for confidential attorney-client communications has not been entirely separated from the exemption from discovery of certain documents and prospective witnesses' statements. There is, instead, a "legal professional privilege" which covers "[c]ommunications passing between a client and his legal adviser together, in some cases, with *communications passing between these persons and third parties.* . . . " *Id.* n. 3 *citing* Cross, Evidence 238 (1958) (emphasis added). *See also* Walsham v. Stainton, 2 Hem. & M. 1, 4 (1863) (Page-Wood, V.C.: "Where the solicitor, in order to enable himself to advise on the matter, calls in some other person to assist and give his opinion," the privilege applies), *cited by id.* n. 3 at 622; Hickman v. Taylor, 153 F.2d 212, 222 n. 16 (3d Cir. 1945), 329 U.S. 495, 510 n. 9, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Similarly, in some of the early United States cases the work product and attorney client privileges were treated as one. In In re Aspinwall, 2 Fed.Cas. 64 (S.D.N.Y.1874), for example, it was held that "the privilege of counsel" covered "information received on behalf of the [client], in regard to the affairs of the [client], from persons to whom the [attorney] was referred by the [client], for the purpose of his obtaining such information, as counsel for the [client]." *Id.* at 64–65. *See also* 8 Wigmore, Evidence, § 2318 n. 5 (McNaughton rev. 1961). Even as late as 1945 the Third Circuit in Hickman v. Taylor based its protection for an attorney's work product on a broadened attorney-client privilege rather than a separate work product privilege. (153 F.2d at 223). *See* C. Wright, Law of Federal Courts 361 (2d ed. 1970). The court noted that the work product protection seemed "to be about what is represented by the English law though the difference in phraseology of the rules makes reference only moderately helpful." Hickman v. Taylor, 153 F.2d at 223 (footnotes omitted). Today, however, most United States courts recognize the principles as distinct. 8 Wigmore, Evidence § 2318 at 625 (McNaughton rev. 1961). *See also* Simon, The Attorney-Client Privilege as Applied to Corporations, 65 Yale L.J. 953, 956 (1956).

From what has been said, it is apparent that the work product doctrine is firmly established as a common law privilege. As such, *Branzburg, supra,* and other cases call for its application in Grand Jury proceedings.

There are, in addition, vital public policy considerations which dictate that the need for protection of an attorney's work product "outweigh[s] the public interest in the search for truth." United States v. Bryan, *supra,* 339 U.S. at 331, 70 S.Ct. at 730. These policy considerations are carefully articulated in Hickman v. Taylor, 329 U.S. at 510–11, 67 S.Ct. at 393, where the Court states:

"Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney.

"Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is es-

sential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed by the Circuit Court of Appeals in this case as the 'work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served."

Similar considerations are expressed in the *Hickman* Circuit Court opinion. Judge Goodrich suggests that

"[t]hose members of the public who have matters to be settled through lawyers and through litigation should be free to make full disclosure to their advisers and to have those advisers and other persons concerned in the litigation free to put their whole-souled efforts into the business while it is carried on. The soundness of this policy is not capable of laboratory demonstration. Enunciated and applied as it necessarily is by members of the guild which derives incidental benefit

from its application, it is open to the gibes of the cynical. We believe it is sound policy; we know that it is irrefutably established in the law." 153 F.2d at 223 (footnotes omitted).

Consistent with *Blair* and *Bryan, supra,* these policy considerations fully justify a work product exception to the general rule that every Grand Jury witness must tell "all that he knows."

■ Although the above-noted policies supporting protection of an attorney's work product were stated with reference to civil litigation, they are even more strongly applicable in criminal proceedings. There is "an especially strong tendency toward the protection of materials as the 'work product' of an attorney in criminal cases. Thus, in relevant criminal cases (admittedly few), the courts have *consistently* held statements by witnesses . . . to be the 'work product' of an attorney." Annot., 35 A.L.R.3d 424 (1971) (footnotes omitted) (emphasis added). In State v. Montague, 101 N.J.Super. 483, 244 A.2d 699 (1968) the state sought access to the defendant's attorney's notes concerning interviews with prospective witnesses. The court states:

"[W]e are satisfied that the notes here in question represented the work product of defendant's attorney and, under the doctrine of Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L. Ed. 451 (1947), production should not have been compelled. The fears therein expressed with regard to the inviolability of an attorney's thoughts and the possibility of inefficiency, unfairness and sharp practice are equally applicable to the setting of a criminal case." 244 A.2d at 702.

The same result has been reached with respect to the defendant's demands to examine materials (especially prospective witnesses' statements) in the hands of the prosecuting attorney. *See* State v. Bowen, 104 Ariz. 138, 449 P.2d 603, 607 (1969); State v. Superior Court, 99 Ariz. 382, 409 P.2d 547, 548 (1966); Fisher v. State, 241 Ark. 545, 408 S.W.

2d 894, 897 (1966); Edens v. State, 235 Ark. 178, 359 S.W.2d 432, 433 (1962); People v. Boehm, 270 Cal.App.2d 13, 75 Cal.Rptr. 590, 595–596 (1969); Colebrook v. State, 205 So.2d 675, 682 (Fla. App.1968), vacated on other grounds, Jones v. Florida, 394 U.S. 720, 89 S.Ct. 1473, 22 L.Ed.2d 675; Adjmi v. State, 208 So.2d 859, 861–862 (Fla.App.1968); Jackman v. State, 140 So.2d 627, 629–630 (Fla.App.1962); Bedami v. State, 112 So.2d 284, 292 (Fla.App.1959); State v. Smith, 431 S.W.2d 74, 81–82 (Mo.1968); State v. Tune, 13 N.J. 203, 98 A.2d 881, 883–886 (1953); Shapard v. State, 437 P.2d 565, 594 (Okla.Cr. App.1967). *See also* Comment, "Work Product" in Criminal Discovery, 1966 Wash.U.L.Q. 321 (1966). While it is true that the cases above involved criminal trials rather than Grand Jury proceedings, we see no reason to distinguish them on that basis. Surely the search for truth is no less compelling at a criminal trial than at a Grand Jury proceeding. The interest in protecting work product which prevails in the former criminal proceeding should, for the same policy reasons, prevail in the latter. Support for this proposition may also be drawn from analogous cases which apply the attorney-client privilege even though no arrest or indictment has yet transpired. *See* In re Ryder, 263 F.Supp. 360, 365 (E.D.Va.), affd., 381 F.2d 713 (4th Cir. 1967); Continental Oil Co. v. United States, 330 F.2d 347 (9th Cir. 1964); annot., 9 A.L.R.3d 1413 (1966). The test of whether the work product doctrine applies is not whether litigation has begun but whether documents were prepared or obtained in anticipation of litigation. Arney v. Hormel & Co., 53 F.R.D. 179, 181 (D.Minn.1971); Congoleum Industries, Inc. v. GAF Corp., 49 F.R.D. 82, 86 (E.D.Pa.1969); United States v. Anderson, 34 F.R.D. 518, 521 (D.Colo.1963); cf. Burnham, Confidentiality and the Corporate Lawyer: The Attorney-Client Privilege and "Work Product" in Illinois, 56 Ill.B.J. 542, 551 & n. 29 (1968); *see* C. Wright, Law of Federal Courts 365 (2d ed. 1970); Com-

ment, "Work Product" in Criminal Discovery, *supra* at 323; Comment, Basic Survey Work Product in Federal and State Jurisdictions in Civil and Criminal Proceedings, 35 Tenn.L.Rev. 474, 476–77 (1968). *See* Generally Developments in the Law-Discovery, 74 Harv.L.Rev. 940 (1961); Comment, The Work Product Doctrine in the State Courts, 62 Mich. L.Rev. 1199 (1964).

We have not failed to note the existence of a few cases which cast doubt on the application of the work product doctrine to Grand Jury proceedings. In particular Schwimmer v. United States, 232 F.2d 855 (8th Cir. 1956), cert. den., 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 and United States v. McKay, 372 F.2d 174 (5th Cir. 1967), are relevant. In *Schwimmer,* the court offers the following unsupported assertion: "[t]he Hickman case is without any application to a grand jury investigation." 232 F.2d at 866. It is, of course, true that *Hickman* was a civil case. The issues stressed in *Schwimmer* involved the attorney-client, rather than the work product, privilege. The factual basis of any work product privilege is not set out in the opinion. In light of the summary treatment of the work product issue in *Schwimmer,* it is doubtful whether the issue with which we are now confronted was fully briefed or considered. To the extent that the *McKay* court has doubts concerning the application of the work product doctrine to an analogous proceeding (372 F.2d at 176), we do not agree.

Nor do we share the Government's view that the proposed Federal Rules of Evidence, 56 F.R.D. 183 (Nov. 21, 1972), offer any support for the Government's position in this case. It is true that Article V, which deals with privileges, does not set forth a work product privilege (*Id.* at 230–261) and that the privileges set forth in Article V are intended to apply at Grand Jury proceedings. *Id.* at 347, Rule 1101(c), (d). Moreover, the language of Rule 501 appears to exclude common law additions to privileges set forth in Article V. Nevertheless, as the Advisory Committee's Note makes clear,

the delineation of privileges in Article V was not intended to affect the scope or application of the work product doctrine. Giving the proposed rule a construction which will "secure fairness in administration," *id.* at 194, Rule 102, we believe they should not be interpreted as a bar to the public policy objectives underlying application of the work product doctrine to Grand Jury proceedings. Furthermore, even if the proposed rules may bear the unfortunate and unlikely construction urged by the Government, they are applicable only if not disapproved by Congress and then only "to actions and proceedings brought [after] July 1, 1973" *Id.* at 184. Hence they are in no way binding in this case.

The *extent* to which the work product doctrine applies to the particular facts of this case remains to be considered. It is clear that Duffy's personal recollections, notes, and memoranda pertaining to his conversations with nonemployees of his client are within the rubric of the work product definition. Annot., 35 A. L.R.3d 424 & n. 11, 428, 430 & nn. 15, 16, 431 & n. 5, 435–38, 464–65 (1971); Hickman v. Taylor, 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947); Comment, "Work Product" in Criminal Discovery, *supra* at 323–25; Comment, Basic Survey of Work Product in Federal and State Jurisdictions in Civil and Criminal Proceedings, *supra* at 478–79. Nevertheless the Government maintains that it has made a showing sufficient to invoke the "good cause" qualification of the work product doctrine thus justifying the compelled relevation of Duffy's work product. What constitutes "good cause" is a difficult and confusing problem which has produced a broad range of purported solutions. *See* Annot., 35 A.L.R.3d 424, 466–68 (1971). It is, however, a problem which need not be resolved in the instant case. This is so because the work product sought in this case is absolutely, rather than conditionally, protected. After the Court in *Hickman* established a conditional protection for most work product materials, it applied

"[a] different rule . . . to the oral statements made by witnesses to the lawyer. To require him to state what he remembers or what he saw fit to write down as to the remarks of a witness would carry additional dangers not involved when the lawyer is merely asked to turn over a statement that the witness has signed. Thus, as to such oral statements, the Court said, 'we do not believe that any showing of necessity can be made under the circumstances of this case so as to justify production.'" C. Wright, Law of Federal Courts 362 (2d ed. 1970) (footnotes omitted).

Justice Jackson's concurring opinion also makes explicit a distinction between the attorney's personal recollections, notes, and memoranda on the one hand and statements prepared or signed by the interviewee on the other. The latter may be discovered by a showing of good cause while the former may not. *See* 329 U.S. at 519, 67 S.Ct. 385.

■ We note that under the Jencks Act, 18 U.S.C.A. § 3500, statements the Government has obtained from witnesses or prospective witnesses are not subject to disclosure until the witness has testified at the trial and then only if the statement falls in any one of the categories set out in Subsection (e) which are:

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

"(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury."

None of the statements involved in our case would fall in any of the categories set out in subsection (e), *supra.* We do not believe that the attorney of a prospective criminal defendant, absent un-

usual circumstances, should be required to produce a summary of a witness's statement which is of a type that the Government would not be required to produce under the Jencks Act.

Furthermore, even if the materials involved in this case were not absolutely protected, the fact that the persons whom Duffy interviewed are known and accessible to the Grand Jury would tend to defeat any good cause showing the Government could possibly offer. "Generally, if a witness is available to the party seeking discovery of his statement to opposing counsel, such discovery should not be allowed." Annot., 35 A.L.R.3d 470 (1971). *See also* Comment, Basic Survey of Work Product in Federal and State Jurisdictions in Civil and Criminal Proceedings, *supra* at 486; Comment, "Work Product" in Criminal Discovery, *supra* at 325; Burnham, Confidentiality and the Corporate Lawyer: The Attorney-Client Privilege and "Work Product" in Illinois, *supra* at 552.

There is no adequate showing in this case that the desired information could not be obtained from the named nonemployees. The United States Attorney, in response to an inquiry from the court as to "what is the good cause for waiving the work product rule," responded:

"[T]he utility of statements made previously to the company attorney, of course, would be that *something different might have been said* to the company attorney and in fact the vigor by which the right not to disclose is pursued would indicate that there is material of substantial value within the possession of Mr. Duffy and I think the Court is absolutely correct in surmising that without being able to get to this source of information, this information is absolutely not obtainable to the government." (Emphasis added.)

We hold that under the record presented by this case Duffy was not required to produce or testify before the Grand Jury with respect to his personal recollections or the contents of summaries he made and conclusions he drew with respect to interviews with the non-employees of his client upon the basis that he was excused from making such disclosures under the work product doctrine. We limit our holding to the facts disclosed by the record in our present case. We do not suggest that the policies supporting the work product doctrine, and therefore its scope, may not vary somewhat depending upon the nature of the proceeding in question. *See* Comment, "Work Product" in Criminal Discovery, *supra* at 335–344. Thus, the exact perimeters of the doctrine and its "good-cause" qualification as applied to materials or proceedings other than those involved in the instant controversy must be left for development in later cases. Other than its conjecture that "something different might have been said," the Government has offered little if any evidence upon which a finding of good cause could be predicated.

The judgment finding defendant in civil contempt is reversed.