**In re GRAND JURY PROCEEDINGS in the Matter OF BROWNING ARMS CO.**

No. 75–1952.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1976.

Decided Jan. 30, 1976.

David M. Rosen, Asst. U. S. Atty., St. Louis, Mo., for appellant.

John J. Sheehy, Rogers & Wells, New York City, for appellee.

Before GIBSON, Chief Judge, CLARK, Associate Justice,* and BRIGHT, Circuit Judge.

PER CURIAM.

This is an appeal from an order of the United States District Court for the Eastern District of Missouri denying the application of the Government to compel F. Seaton Prince to appear and testify and produce before the United States Grand Jury for said District a memorandum dated July 5, 1974, which he prepared and presented to a special meeting of the Board of Directors of Browning, Inc. (Browning), held on July 9, 1975. Prince appeared but refused to deliver the memorandum to the Grand Jury, invoking both the attorney-client[1] and the work product privilege; and on the application of the Government to compel such disclosure and to require Prince to testify, the court found that "the matters contained in the memorandum

---

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation.

1. On appeal Prince abandons his claim of attorney-client privilege and relies solely on the

attorney's work product doctrine. However, since an attorney-client relationship must be present in any event, we develop the full facts.

. . . contained privileged matters and were product of F. Seaton Prince's law firm" and ". . . that F. Seaton Prince not be required to produce the subpoenaed document and testify in response to all questions." We cannot agree and reverse the judgment and direct that on remand an order be entered requiring Prince to produce the memorandum to the Grand Jury and to respond to questions as provided in the summons.

### I. The Facts.

Prince was attending a Board of Directors meeting of Browning on May 17, 1974. He was a member of the Board, and his firm was general counsel of Browning. During the meeting John Val Browning (JVB), President of the company, advised the meeting as to certain custom declarations that Browning had been filing over a period of years with reference to the importation of firearms. He explained that Browning had uniformly failed to answer question 8(a) on the custom form which inquired as to whether any "assists" had been paid by Browning on certain of its foreign purchases. Toward the close of the discussion, Prince told the Board that he thought "the matter should be investigated a little bit more thoroughly, at least as far as I was concerned." He stated his position in his testimony in the District Court as follows:

> I came to the conclusion that it was my duty as a director, it was my duty as a stockholder—I have a substantial number of shares; I was mindful of situations such as 10 B5 cases; I was mindful of the duties of a director; I was at all times mindful of what I thought was the best interest of the company; and so I proceeded to delve into the matter a little more thoroughly.

Prince kept longhand notes on his interviews, etc., and would later transform them into a memorandum. The memorandum covering his notes on the May 17th Board meeting read in part:

As I presently see my obligations, they are that this matter be investigated to the fullest extent. If the facts develop that there has been active fraud or gross negligence on the part of certain individuals in the company, then I think that I should so inform the Board so that they can take such action as they deem to be in the best interests of the company and its stockholders. Under no circumstances should the directors of the company be in a position of condoning or covering up fraudulent or grossly negligent acts.

The July 5th memorandum which the Grand Jury seeks was filed under seal, and we have examined it again and again. We do not deem it appropriate to reveal in any detail its content, but we can say that our examination of it indicates that its thrust is entirely toward the liability of the Directors and stockholders and the removal of the President of Browning, rather than the liability of Browning on the customs matter. Indeed, Mr. Prince himself testified that New York and Washington lawyers were special counsel on the customs matter. It is true that he conferred with Bondy, the New York lawyer, but the whole thrust of that meeting was on the ouster of the President of Browning.

The entire work of Prince rather than employing the skill and training of a lawyer utilizes solely investigative activity in which Prince is endeavoring to find out, as he testified, the facts as to his and his fellow Directors' liability, as well as that of stockholders (of which he and his family were substantial ones); and to develop, as he said in his statement of May 17th when he undertook the inquiry, whether the matter involved fraud or gross negligence on the part of individuals in the company. The memorandum reveals nothing as to the details of the involvement of the corporation; nor any evidence that Prince was employed or that he thought at the time that he was so acting. He never kept any "time slips" whatever as to this matter, although his firm charged on a time

basis, and while his firm sent Browning a bill for services, it did not include any of Prince's time. He testified that possibly there was some in there for him, but he was too old to keep time. In fact he had not handled any legal matter for Browning since 1970 or 1971. Prince points to Val Browning coming to his office a week or ten days after the Directors' meeting (May 17th) and that he told Browning "what I proposed to do and what I was doing and my concern and he in effect gave me the green light to go ahead with my investigation." We note, however, that Prince, upon being questioned by the District Judge, testified:

> So then you could not say in May of '74 that you were going to represent Browning on these matters relating to Custom's problems?
>
> No, I couldn't truthfully say that. I think, however, had the Board followed my recommendation. I think that I could have billed Browning for the entire time and effort and whatever I put in on the problem and I would have been paid for services rendered.

We note that the District Judge found that the memorandum was "the product of F. Seaton Prince's law firm." But the testimony shows to the contrary. Mr. Miller, a member of Prince's firm did sit in on some of Prince's inquiries and accompanied him to New York, but Prince testified that he prepared the memorandum and Miller only checked the dates, etc. The memorandum was signed "Respectfully submitted, F. S. Prince" and, while on the memorandum stationery of the firm, was not shown to be in its custody; indeed, a copy was given each Director, and it was read by Prince as his memorandum and was so represented to the Chairman of the meeting.

An addendum to the 17-page memorandum is in Prince's handwriting and, though not included in the subpoena because it was not known, it reveals that a chronology and analysis of the customs matter prepared by New York and Washington lawyers was also circulated to the Directors but was later recouped for Browning's files as confidential. Prince's memorandum was then circulated and read to the Directors by him. Upon his motion to discharge JVB, no second was made and Prince then resigned as a Director.

## II. The Law.

■ Prince commendably foregoes his claim of an attorney-client privilege as it could not pass muster under the facts here; but, in lieu thereof, he claims protection under the attorney-client work product rule. He cites in support of his contention a line of cases beginning with *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), and extending down to *In re Grand Jury Proceedings, Duffy*, 8 Cir., 473 F.2d 840, which was decided in this Circuit in 1973. But reliance on these cases is wholly misplaced, for in all of them an attempt was made to secure written statements, private memoranda or personal recollections, prepared or formed *by an adverse party's counsel* in the course of his legal duties. Here the relationship, rather than being one of attorney and client, was one of director and corporation; Prince from the beginning (". . . it was my duty as a director . . . a stockholder . . . to delve into the matter a little more thoroughly") to the end (". . . you could not say in May of '74 that you were going to represent Browning in . . . Customs problems? No, I couldn't truthfully say that"), was acting as a director, a stockholder in his investigation. He was investigating, as he said, to see if "there has been active fraud or gross negligence on the part of certain individuals in the company," and after he finished his investigation, he concluded that the President should be removed, and he informed "the Board so they can take such action as they deem to be in the best interests of the company and its stockholders." The Board did not agree with Prince, and he resigned. The record not only shows that the investigation was conducted personally by Prince but that a non-lawyer investigator could have

**1304**

done all of the work, and as a consequence the memorandum enjoys no privilege either under the attorney-client theory or the work products rule. As far as the memorandum being the work product of the law firm, there is nothing in the record showing that the law firm was employed. The record shows that when Browning wished legal advice from Prince's firm, it contacted the lawyer in the firm and requested whatever legal work it desired; the cost of the service was billed according to the time used and expenses. There is nothing in the record indicating Browning contacted Miller or anyone else in the firm. While Miller was present at the Val Browning interview, he must have been there at the request of Prince, not Browning. It is true that Browning paid the expense of Miller to New York in company with Prince, but that was on the effort to oust JVB, not on any litigation or prelitigation, all of which was being handled by the New York firm.

We have carefully read all of the cases cited by Prince, and each one holds implicitly that if there is no attorney-client relationship, there is no work product privilege. The principle is so basic that it is elementary. See *Hickman v. Taylor, supra*; *In re Grand Jury Proceedings, supra*; and *Hughes v. Pa. RR Co.*, 7 F.R.D. 737 (E.D.N.Y.1948).

In addition, all of the cases hold that the documents sought must have been prepared or obtained in anticipation of litigation. Here Browning employed the New York and Washington lawyers to handle any matters coming up on the customs case; indeed, Prince readily admitted that he was not so employed. The record indicates no other matter that might have been the subject of litigation, either civil or criminal.

■ Nor was it necessary for the Government to make any showing of "good cause" for the production of the memorandum since we find that it does not come within the work product of Prince or his firm. In passing we note that not even a list of witnesses interviewed by Prince was furnished the Grand Jury, without which a meaningful investigation could not be conducted. *See In re Grand Jury Proceedings, supra.*

*Recapitulation.*

We hold that no attorney-client relationship existed between Prince or his firm and Browning and that the district court's finding in this respect is clearly erroneous; that the Grand Jury was entitled to have the memorandum, and an order so directing should have been entered. The judgment is, therefore, reversed, and the matter is remanded to the district court with directions that orders be entered in conformance with this opinion.