James GEORGE, Appellant-Defendant,

v.

STATE of Indiana, Appellee-Plaintiff.

No. 1–179A4.

Court of Appeals of Indiana, Fourth District.

Dec. 17, 1979.

Mary M. Runnells, Bloomfield, for appellant-defendant.

Theodore L. Sendak, Atty. Gen., Rollin E. Thompson, Asst. Atty. Gen., Indianapolis, for appellee-plaintiff.

CHIPMAN, Judge.

Defendant James George was charged by indictment with Involuntary Manslaughter and convicted by a jury of the lesser included offense, Battery Resulting in Serious Bodily Injury.[1] George appeals from this conviction raising the following issues for our review:

1. Whether there is sufficient evidence to support the verdict;

2. Did the trial court err by admitting into evidence certain statements made by the defendant to police officers;

3. Whether the trial court erroneously ordered the defendant to produce the work-product of his attorney;

4. Was the jury panel selected in a manner contrary to law; and

5. Whether the trial court erred by giving final instruction No. 27.

We affirm.

1. Ind.Code 35–42–2–1(3).

## I. SUFFICIENCY OF THE EVIDENCE

Defendant George contends the verdict is contrary to law in that it is unsupported by sufficient evidence of probative value. We hold there is sufficient evidence to support the defendant's conviction.

In reviewing the sufficiency of the evidence, we do not weigh the evidence or judge the credibility of witnesses. We consider only that evidence most favorable to the State, together with all reasonable and logical inferences to be drawn therefrom. Where there is substantial evidence of probative value supporting the verdict, the conviction will not be set aside. *Poindexter v. State*, (1978) Ind., 374 N.E.2d 509; *Grigsby v. State*, (1978) Ind., 371 N.E.2d 384.

The elements of Battery Resulting in Serious Bodily Injury are: (1) knowingly or intentionally (2) touching another person (3) in a rude, insolent or angry manner (4) resulting in serious bodily injury. The evidence most favorable to the State shows that during January 1978, the defendant and the victim, Wilbert Uland, were the only tenants living at the Vosloh rooming house in Bloomfield, Indiana. Their respective rooms were located on the second floor of the house, accessible by way of a stairway located just inside the front door of the building. The men shared a common bathroom, which was also located on the second floor.

On January 10, 1978, at approximately 9:40 p. m., Uland was found unconscious on the front porch of the rooming house. Blood stains were found running from the top of the staircase down to the front door of the building. Medical examination disclosed the victim had a broken jaw, several broken ribs, and numerous cuts and bruises. The bulk of Uland's injuries were to the left side of his body, leading Dr. Richard Rak, the treating physician, to conclude the victim had been hit repeatedly with a blunt instrument, or perhaps kicked. Uland never regained consciousness. The immediate cause of the victim's death was pneumonia, which was linked to his injuries.

The defendant's whereabouts were traced until he was last seen leaving the O.K. Coral Bar in Bloomfield at approximately 8:30 p. m. on the night in question. He was next observed in his room at the Vosloh rooming house at 11:00 p. m., passed out on his bed, his clothes in a state of disarray.

On January 11, defendant told several police officers he had been involved in an altercation with the victim the previous evening. At trial, Officer James Hartsburgh testified as to what the defendant told him about the incident:

Q. What did the defendant say to you?

A. He said on the night of the evening of January 10th, which would have been last night, that he the defendant had left his room to use the bathroom, the back bathroom being the only one there I believe and that as they went there the doorss [sic] shut and Uland said there was inside using the bathroom it was occupied at that time. So the defnedant [sic] took a seat outside the door and waited his turn, that Uland said the [sic] opened the door to come out and that the defendant stood and when he did for no apparent reason that Uland struck him in the left eye of his face.

. . . . .

A. I then continued with this questioning. I asked the defnedent [sic] what he had done after Uland subject struck him in the left eye. He stated that he grabbed Uland by the front of his shirt and shoved him up against the wall. I asked George if he would, the defendant if he would get up and I got up and walked to the end of the table if he would show me just how he had grabbed Uland and shoved him. Which he did.

Officer David West also spoke with the defendant about his altercation with the victim. At trial, West testified as follows:

A. I ask him what had happened to Mr. Uland. He said that he had came in the night before that he had wentto [sic] the restroom and when he came·

out of the restroom Uland, he described him as the old man, was standing there apparently waiting to go into the restroom when he walked out of the restroom the defendant told me he told the old man why don't you go in and take a bath you stink at that time the way he described it the old man clipped him. He pointed to his left eye. I said, what did you do? He said, what would you have done, I clipped him back.

Q. Those were his words? What would you have done, I clipped him back.

A. To the best of my recollection yes.

■ Circumstantial evidence is no different from other evidence for the purpose of determining whether there is evidence of probative value from which a reasonable trier of fact can infer the defendant's guilt beyond reasonable doubt. *Mitchell v. State*, (1977) 266 Ind. 656, 366 N.E.2d 183. Corpus delicti and criminal agency of the defendant may be proved by circumstantial evidence. *Ellis v. State*, (1969) 252 Ind. 472, 250 N.E.2d 364. Circumstantial evidence, standing alone, may sufficiently support a conviction. *Hartman v. State*, (1978) Ind. App., 376 N.E.2d 100. The evidence in this case placed the defendant at the scene of the crime approximately one hour before the victim was found. The defendants were the only two tenants at the boarding house. This evidence, considered in light of the defendant's statements as to his having "clipped" the victim on the night in question, is sufficient to support the conviction.

## II. ADMISSIBILITY OF DEFENDANT'S STATEMENTS

On January 11, 1978, the defendant made certain incriminating statements to police officers about the altercation he had had with the victim the previous evening. On appeal, defendant contends the trial court erred in allowing these statements to be admitted into evidence. In support of this contention, defendant argues he was so intoxicated at the time the statements were made he was incapable of knowingly and intelligently waiving his *Miranda* rights, and in any event, his intoxication rendered any statements involuntary. We hold the statements were properly admitted into evidence.

■ The question of the admissibility of a confession is to be controlled by determining, from the totality of the circumstances, whether or not it was made voluntarily. *Chambers v. State*, (1979) Ind., 392 N.E.2d 1156; *Richardson v. State*, (1978) Ind., 373 N.E.2d 874. The same test determines whether a waiver of *Miranda* rights has occurred. *Chambers, supra; Ortiz v. State*, (1976) 265 Ind. 549, 356 N.E.2d 1188. We are required to review these questions on appeal as we do other sufficiency issues. We cannot weigh evidence; rather, we are limited to a determination of whether there is substantial probative evidence to support the trial court's finding. *Murphy v. State*, (1977) Ind., 369 N.E.2d 411.

■ When a defendant challenges the voluntariness of a statement by alleging he was under the influence of drugs, he must introduce evidence from which it could be concluded that the amount and nature of the drug consumed would produce an involuntary statement. *Layton v. State*, (1973) 261 Ind. 251, 301 N.E.2d 633. The mere fact a statement was made by the defendant while under the influence of drugs does not render it inadmissible per se. Intoxication, however, is one factor to be considered by the trier of fact in determining whether a statement was voluntary.

At the suppression hearing held May 11, 1978, Officer Hartsburgh of the Bloomfield Police Department testified he went to the Vosloh rooming house at approximately 5:00 p. m. on January 11, 1978, to find out what he could about Uland's injuries. The officer knocked on the door and was admitted by the defendant. Hartsburgh then asked George whether he was present the previous evening or whether he knew anything about Uland's having been admitted to the hospital. The defendant apparently did not respond, but invited Hartsburgh to

sit down with him at a table located on the ground floor of the rooming house. Officer Hartsburgh testified that while he detected the smell of alcohol, the defendant walked to the table normally, without need of support and spoke clearly without slurring his words.

Once seated at the table, the officer again asked the defendant whether he had heard anything or knew anything about what had taken place the previous evening. At this point, the defendant responded, "Yeah, I know something about that. He punched me in the eye." Officer Hartsburgh immediately stopped the conversation and informed the defendant of his *Miranda* rights. In response, the defendant stated he understood those rights, and asked whether he was under arrest. Hartsburgh told the defendant he had no reason to place him under arrest at that time.

Officer Hartsburgh then asked the defendant to continue his recount of the events of the previous evening. The defendant, without hesitation, and in narrative form, told the officer of his altercation with Uland. At Officer Hartsburgh's request, the defendant climbed the rooming house stairs to the second floor, and there reinacted for the officer the events which he previously described. Hartsburgh testified the defendant had no trouble climbing the stairs and in fact did so without the assistance of a handrail.

At approximately 5:45 p. m., Officer David West arrived at the Vosloh rooming house. West testified that after talking with Officer Hartsburgh, the defendant, while standing at the top of the stairs, called down to Officer West and asked, "What the hell is going on?" West responded, "I don't know, I just got here." The defendant then said, "Well why don't you come up and we will talk about it." Officer West then went up to defendant's room, at which time defendant George again told the story of his altercation with the victim on the night of January 10, 1978. West testified that while the defendant was drinking beer during this conversation, in his opinion, George was not intoxicated.

Officer West returned to the Vosloh rooming house that evening at approximately 9:00 p. m. with other investigators to take pictures and measurements of the inside of the building. While they were present, defendant George appeared in the doorway of his room and invited West and Officer Hotsclaw into his room to talk. Again the defendant told the officers of his altercation with the victim on the night of January 10. West testified the defendant spoke clearly and appeared to understand what was said to him. Officer Franklin, who was also present for ten minutes of this conversation testified the defendant acted and spoke normally.

We first address the defendant's contention that he was unable to knowingly and intelligently waive his *Miranda* rights. The procedural safeguards of *Miranda* only apply to what the United States Supreme Court has termed "custodial interrogation." *Oregon v. Mathiason*, (1977) 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714; *Bugg v. State*, (1978) Ind., 372 N.E.2d 1156. The principles announced in *Miranda v. Arizona* deal with the protection which must be given to the privilege against self-incrimination when the individual is subject to police interrogation while in custody or otherwise deprived of his freedom of action in any significant way. When, however, the compelling atmosphere inherent in custodial interrogation is not present, *Miranda* warnings are not required.

 We fail to find such a compelling atmosphere or environment in this case. The defendant was not under arrest during any of the three conversations with police on January 11, 1978. Nor was the defendant deprived of his freedom of action in any way. Indeed, the defendant invited the police officers into his living quarters to talk. The police questioning, therefore, was not custodial. *Miranda* has no application.

 However, for the defendant's statements to be admissible, the trial court had to find the statements were made voluntarily. The defendant testified at the suppression hearing, stating he had been drinking

heavily January 11, 1978, and could not even remember the police visits to the rooming house that day. George testified he consumed some two pints of whiskey, and over two dozen cans of beer during the day. The defendant's sister testified that sometimes the defendant acts quite normally, even though he is heavily intoxicated.

This evidence conflicted with the testimony of the various police officers who stated the defendant was coherent during their conversations. We will not, however, reweigh the evidence. Reviewing the totality of the circumstances, there is substantial evidence to support a finding beyond reasonable doubt that the defendant's statements to police officers were made voluntarily. The statements were, therefore, properly admitted into evidence.

### III. WORK–PRODUCT

On April 11, 1978, the State filed a discovery motion in which it requested from the defendant the following information:

2. The statements of any witnesses to be called by the defendants in this action.

3. The substance of any oral statements made by any witnesses to be called by the defendant in this action.

4. Any memorandum containing substantially verbatim report of oral statements made by witnesses to be called by the defendant in this action and a list of memoranda reporting or summarizing such witnesses oral statements.

The defendant objected to this portion of the State's discovery motion, arguing the material requested was the work-product of his attorney. The trial court overruled his objections, and ordered compliance. On appeal, defendant contends the lower court erred by ordering him to comply with the State's discovery motion, and as a result, his attorney's trial preparation was severely hampered. We hold the information requested by the State in paragraph two, three and four of its motion which would require work-product as hereinafter defined was not discoverable, and therefore, the trial court erred by ordering the defendant to comply with the State's request.

A trial court has the inherent power to grant various types of discovery in criminal cases. This power is grounded in the trial court's authority to guide and control the proceedings before it. *State ex rel. Grammer v. Tippecanoe Circuit Court,* (1978) Ind., 377 N.E.2d 1359; *State ex rel. Keller v. Criminal Court of Marion County,* (1974) 264 Ind. 420, 317 N.E.2d 433. It has been said the guiding principle of discovery in criminal cases is that of reciprocity; when exercising its discretion in discovery rulings, the trial court must balance discovery privileges between the parties. *Keller, supra; Haskett v. State,* (1979) Ind. App., 386 N.E.2d 1012. Furthermore, we may not disturb a trial court's discovery order unless its discretion is clearly abused. *Vaughn v. State,* (1978) Ind., 378 N.E.2d 859.

The work-product doctrine was first expounded by the United States Supreme Court in the landmark case of *Hickman v. Taylor,* (1947) 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451. In *Hickman,* the trial court commanded defendant's counsel to produce all written statements of witnesses and to state in substance any facts learned through oral statements of witnesses. This disclosure was ordered without any showing by the plaintiffs of the necessity for the production of any of the material or any demonstration that denial of production would have caused hardship or injustice. The U.S. Supreme Court held the statements taken by defense counsel in anticipation of litigation were "work-product," and not subject to pre-trial discovery absent a showing of necessity.

Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the

irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in *interviews, statements, memoranda*, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed by the Circuit Court of Appeals in this case [[*Hickman v. Taylor*] 153 F.2d 212, 223] as the "Work product of the lawyer." Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served. (emphasis added)

329 U.S. at 510, 511; 67 S.Ct. at 393, 394.

Our Supreme Court incorporated the work-product doctrine into Indiana law with the adoption of Ind. Rules of Procedure, Trial Rule 26(B)(2), which provides in relevant part:

(2) Trial preparation: Materials. Subject to the provisions of subdivisions (B)(1) and (3) of this rule, a party may obtain discovery of documents and tangible things prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) *only upon a showing of good cause therefor*, except that a statement concerning the action or its subject-matter previously given by the party seeking the statement may be obtained without such a showing. (emphasis added)

We are aware that in *State ex rel. Keller v. Criminal Court of Marion County*, (1974) 264 Ind. 420, 317 N.E.2d 433, our Supreme Court upheld a trial court's discovery order which commanded the defendant to produce the name and last known addresses of persons he intended to call as witnesses, together with their relevant written or recorded statements, including memoranda reporting or summarizing their oral statements. However, in *Keller* the defendant did not raise, nor did the court address the issue of work-product. The defendant in *Keller* merely argued such disclosure violated his Fifth Amendment rights under the United States Constitution. Therefore, we do not think *Keller* is dispositive.

In *United States v. Nobles*, (1975) 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141, the U.S. Supreme Court discussed the work-product doctrine and its relationship or applicability to the criminal justice system. The court noted that although the doctrine has been asserted most frequently as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital.

The interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case.

422 U.S. at 238, 95 S.Ct. at 2170.

A number of other state and federal courts have applied the work-product doctrine to criminal proceedings, protecting the files of the prosecution and the accused alike. *See e. g., Arizona v. Bowen*, (1969) 104 Ariz. 138, 449 P.2d 603, *cert. denied*, 396 U.S. 912, 90 S.Ct. 229, 24 L.Ed.2d 188; *Peel v. Florida*, (1963) Fla.App., 154 So.2d 910; *Duffy v. United States*, 473 F.2d 840 (8th Cir. 1973); *In re Terkeltoub*, 256 F.Supp. 683 (S.D.N.Y.1966).

We note that neither the American Bar Association's standards relating to criminal discovery,[2] nor the Federal Rules of Crimi-

2. American Bar Association Project On Standards For Criminal Justice: Discovery and Procedure Before Trial (1970).

The A.B.A. standards allow the prosecution to discover only those statements of *experts* which defense counsel intends to use at a trial

nal Procedure allow pre-trial discovery by the prosecution of witness' statements taken by defense counsel. In fact, Federal Rule 16 specifically exempts this material:

(2) Information Not Subject to Disclosure. Except as to scientific or medical reports, this subdivision [Disclosure of Evidence by Defendant] does not authorize the discovery or inspection of reports, memoranda, or other internal defense documents made by the defendant, or his attorneys or agents in connection with the investigation or defense of the case, or of statements made by the defendant, or by government or defense witnesses, or by prospective government or defense witnesses, to the defendant, his agents or attorneys. (bracketed material supplied)

Federal Rules of Criminal Procedure, Rule 16(b)(2).

■■■■ Therefore, we hold witness statements taken by the defendant, his attorney, or his agents in anticipation of litigation are not subject to pre-trial discovery by the prosecution over a timely work-product objection. This conclusion is buttressed by other Indiana decisions which have held a *defendant* may obtain production of a prosecution witness' pre-trial statement only *after the witness whose statement is sought has testified on direct examination.* *Morris v. State,* (1975) 263 Ind. 370, 332 N.E.2d 90; *Antrobus v. State,* (1970) 253 Ind. 420, 254 N.E.2d 873. Allowing the prosecution a general pre-trial fishing expedition into defense files in light of the holdings in *Morris* and *Antrobus* would certainly defy any notions of "reciprocity." Therefore, the trial court clearly abused its discretion when it ordered the defendant in this case to produce statements of defense witnesses.

■■■■ The defendant, however, has failed to demonstrate the trial court's error dictates a reversal in this case. No defense witness' statements were ever provided to the State. The defendant alleges his attorney ceased taking written or recorded statements of any kind from potential witnesses as soon as the State's discovery motion was filed. As a consequence, the defendant argues, at least one witness could not be called because at the last moment, he denied statements made earlier to defense counsel and there was no written version to contradict the prior statements.

This bald assertion is unsupported by any reference to the identity of the lost witness or to the substance or nature of his or her testimony. We cannot determine whether the testimony was critical or merely cumulative. The defendant has failed to show reversible error.

## IV. JURY SELECTION

■■■■ Defendant George next contends the trial court erred by overruling his Motion to Quash the Jury Panel, since it was selected in a manner contrary to law. In support of his argument, defendant cites Ind. Code 33–4–5–2 which provides in pertinent part:

Said commissioners shall immediately, from the names of legal voters and citizens of the United States on the latest tax duplicate and the tax schedules of the county, examine for the purpose of determining the sex, age and identity of prospective jurors, and proceed to select and deposit, in a box furnished by the clerk for that purpose, the names, written on separate slips of paper of uniform shape, size and color, of twice as many persons as will be required by law for grand and petit jurors in the courts of the county, for all the terms of such courts, to commence with the calendar year next ensuing. *Each selection shall be made as nearly as possible in proportion to the population of each county commissioner's district.*

---

or hearing. Discovery by the defendant is much broader; however, standard 2.6(a) expressly incorporates the work-product rule into the A.B.A. standards by exempting from discovery any "legal research or records, correspondence, reports or memoranda to the extent that they contain the opinions, theories or conclusions of the prosecuting attorney or members of his legal staff."

Specifically, defendant claims the manner in which the names of prospective jurors were selected to be placed in the jury box for jury duty in Greene County was unlawful in that it did not result in a selection "made as nearly as possible in proportion to the population of each county commissioner's district." Defendant states the selection procedure was as follows:

1. A number was picked at random, e. g. 5;

2. All townships in the county were listed in either alphabetical or reverse alphabetical order, the order alternating each time names were selected for the box;

3. The jury commissioners then took every fifth (for example) name from the voting lists of the townships in the order in which they had been placed and put them in the jury box. When 800 names had been selected, the commissioners would stop selecting names, regardless of whether jurors had been taken from all of the townships in the county.

The townships in Greene County are not geographically arranged in an alphabetically random manner. Rather, the fifteen townships, listed alphabetically, move *generally* from east to west.[3] Defendant claims that *if* 800 names were selected after only half of the townships had been used, then all of the townships in the Eastern Commissioner's district would have been utilized, less than half the townships in the Center Commissioner's district, and only one township in the Western Commissioner's district. Thus, the defendant argues the prospective jurors selected would not proportionately reflect the population of each county commissioner's district.

---

**3.** The following is an alphabetical listing of Greene County townships along with each townships respective locations:

*Beech Creek* (Eastern District)
*Cass* (Central and Western Districts)
*Center* (Eastern District)
*Fairplay* (Center District)
*Grant* (Western District)
*Highland* (Eastern and Central Districts)

For this court to determine whether there has been substantial compliance with I.C. 33–4–5–2, we would have to know the number of prospective jurors selected from each County Commissioner's district at the time the defendant's jury panel was selected for this case, as compared to the population of each district. Only then could we decide whether the selection of prospective jurors in Greene County was made "as nearly as possible in proportion to the population of each county commissioner's district." However, the defendant has not provided this court with an adequate record. Nowhere is reference made to the populations of each Commissioner's district. More importantly, we are not told what the actual selection procedure was. Defendant states that, "for example" the name of every fifth person was selected from the voting list of townships, and "if" the names of 800 jurors were selected after using only one half the townships, the resulting selection would not proportionately reflect the population of each district. However, we are not concerned with hypotheticals. We are only concerned with the selection procedure *actually used.* If, for instance, a random number larger than five were chosen, more townships might have been utilized in the selection process. Regardless, we will not speculate. It was the defendant's responsibility to provide this court with sufficient record upon which a reversal could be based. In this respect, he has failed. Therefore, we cannot say the trial court erred by denying the defendant's motion to quash the jury panel.

## V. JURY INSTRUCTIONS

█ Finally, the defendant contends the trial court erred by instructing the jury, "your duty demands that you be equally just to the defendant and to the State." This instruction, the defendant argues, was

*Jackson* (Eastern District)
*Jefferson* (Central District)
*Richland* (Eastern and Central Districts)
*Smith* (Central and Western Districts)
*Staford* (Western District)
*Stockton* (Western District)
*Taylor* (Eastern and Western Districts)
*Washington* (Central and Western Districts)
*Wright* (Western District)

misleading and prejudicial in that it implied the State and the accused are on equal footing in a criminal trial, giving the jury the impression that the defendant was obligated to present evidence on his own behalf.

The entirety of the court's final instruction No. 27 reads:

Members of the Jury, you are about to retire to the jury room to deliberate upon your verdicts in this matter. Evidence has been introduced to assist you in determining the facts of this case, and I have endeavored to advise you as to the applicable law you should consider in arriving at your verdicts. You are now confronted with the duty of determining the guilt or innocence of the defendant. I submit the case to you with confidence that you will discharge this responsibility without being swayed by any undue demand for conviction by the State or any undue appeal to your sympathy by the defendant. *Your duty demands that you be equally just to the defendant and to the State.* You should bear in mind that the liberty of an accused should not be taken from him by careless or inconsiderate judgment; however, if, after a careful consideration of the evidence and the law, you are satisfied beyond a reasonable doubt of the defendant's guilt, you should return your verdicts accordingly. As citizens charged with the duty of assisting the Courts in the administration of justice, you should put aside any consideration of public approval or disapproval, carefully consider the evidence and the law of the case, and return into Court such verdicts as you believe are just. (emphasis added)

We find nothing inappropriate or prejudicial in the language of this instruction. The jury was told to weigh the facts of the case impartially, without regard to undue demands of conviction from the prosecution or appeal for sympathy from defense counsel. This in fact was the jury's responsibility. As the defendant readily admits, the jury was also instructed the State carried the burden to prove defendant's guilt be-

yond reasonable doubt. Therefore, we find no error in the giving of final instruction No. 27.

The conviction is affirmed.

MILLER, P. J., and YOUNG, J., concur.