599 F.2d 504
 79-1 USTC P 9405, Fed. Sec. L. Rep. P 96,917
 In re GRAND JURY SUBPOENA Dated December 19, 1978, Issued to
General Counsel, John Doe, Inc.
GENERAL COUNSEL, John Doe, Inc. and John Doe, Inc., Appellants,
v.
UNITED STATES of America, Appellee.
 No. 1061, Docket 79-1136.
 United States Court of Appeals,
Second Circuit.
 Argued May 3, 1979.
Decided May 21, 1979.
 
 Lawrence S. Feld, New York City (Jules Ritholz, James J. Mahon, Kostelanetz & Ritholz, and Michael Loening, Everett, Johnson & Breckinridge, New York City, of counsel), for appellants.
 Gregory L. Diskant, Asst. U. S. Atty., S. D. N. Y., New York City (Robert B. Fiske, Jr., U. S. Atty., and Howard W. Goldstein, Asst. U. S. Atty., S. D. N. Y., New York City, of counsel), for appellee.
 Before GURFEIN and MESKILL, Circuit Judges, and MILLER, Judge.*
 GURFEIN, Circuit Judge:
 
 
 1
 The general counsel and John Doe, Inc. appeal from a judgment of civil contempt by the District Court for the Southern District of New York (Hon. Lawrence W. Pierce, Judge).[1] Preliminary to the contempt, a motion was made to quash the grand jury subpoena demanding the production of certain documents under Rule 17 of the Federal Rules of Criminal Procedure. After the motion was denied, counsel respectfully refused to comply with the order enforcing the subpoena and Judge Pierce held the company and the counsel in civil contempt. The general counsel and John Doe, Inc. appeal from the order adjudging them in civil contempt.[2]
 
 
 2
 The District Court wrote an unreported opinion on its earlier denial of the motion to quash the subpoena. We adopt its statement of facts as follows (A 172-175):
 
 
 3
 "For the purposes of this motion, the following allegations of the petitioner are taken as true. John Doe, Inc. ("John Doe") is a publicly owned corporation engaged in the manufacture and sale of various pharmaceuticals, household products, cosmetics, toiletries, chemicals and environmental control systems. Besides its numerous domestic divisions and subsidiaries, petitioner has one hundred seventeen foreign subsidiaries in one hundred twenty-five countries.
 
 
 4
 "In November, 1975, it was notified by its independent auditors, Price Waterhouse & Co., of possible illegal payments to foreign officials by employees of John Doe's foreign subsidiaries during the period 1970 through 1974. A preliminary investigation was conducted by John Doe's management, the results of which induced its board of directors to authorize a broader investigation by its Audit Committee. The firm of Covington & Burling was retained as legal counsel to assist petitioner's vice-president and general counsel in this second investigation in January, 1976. Price Waterhouse & Co. was also retained as outside accountants to aid in the investigation. As part of this investigation, numerous employees of John Doe were required to complete a questionnaire which had been drafted by Covington & Burling and to submit to interviews conducted by members of that firm.
 
 
 5
 "The objective of this investigation was not merely to ascertain the amount, if any, of illicit foreign payments made during this period, but also for the purpose of preparing an 8-K report which was to be submitted to the Securities and Exchange Commission. By submitting such a report John Doe hoped to participate in the SEC's Voluntary Disclosure Program and thereby avoid federal securities litigation. A third purpose of the investigation was to prepare for possible government criminal and tax actions as well as shareholder derivative suits. Covington & Burling provided legal advice concerning what should be included in the report and also advice concerning other possible future litigation.
 
 
 6
 "The results of this investigation were generally disclosed in an 8-K report filed with the SEC in February, 1976. The SEC subsequently met with John Doe's representatives who revealed some of the detailed results of the investigation. Petitioner contends that its representatives had expressly refused to reveal those details of the investigation which it now claims to be protected by the attorneyclient privilege. However, an SEC representative who was present at that meeting contends that John Doe had agreed to make all of the underlying documentation of the investigations available for the SEC's inspection, but hesitated to permit photocopying of the documents.
 
 
 7
 "The Grand Jury has undertaken an investigation of possible violations of federal law arising out of foreign payments. It has subpoenaed various documents from petitioner, some of which have been provided. The items subpoenaed are documents relating to both of petitioner's investigations including: (1) questionnaires completed by petitioner's employees and others; (2) notes taken at all interviews; (3) memoranda relating to all interviews; (4) all summaries and reports; and (5) all accountant's workpapers. John Doe has moved to quash the Grand Jury subpoena of these items on the grounds that the attorney-client and work-product privileges protect these items." (Footnote omitted.)[3]
 
 
 8
 The problem stemmed initially from a disclosure that the Mexican Government had disallowed certain tax deductions of a John Doe subsidiary because the money had been used to bribe Mexican officials. This resulted in a voluntary preliminary inquiry which sought information concerning all foreign payments of a questionable nature that may have been made to foreign government officials. Three senior officials conducted this first investigation. It is now claimed they were deputized by the general counsel to gather information about such payments. Employees of the company were instructed to cooperate fully and to disclose whatever knowledge each had of questionable payments while in the company's employ. The investigators, purportedly acting under the instructions of the general counsel, prepared memoranda and notes which were submitted to him. The results were reported to the Board of Directors at meetings on December 5, 1975 and January 9, 1976.
 
 
 9
 After the report on the first investigation was filed, the Audit Committee of the Board decided, in late January 1976, to hire Covington & Burling ("Covington") of Washington, D. C., as special counsel to assist the general counsel regarding all the legal aspects concerning questionable payments. The special counsel began a second investigation and also advised about the desirability of the company's participation in the "voluntary disclosure" program of the SEC.
 
 
 10
 On March 9, 1976, after receiving this legal advice, the company filed an 8-K report with the SEC disclosing generally that questionable payments had been made by the company from 1970 through 1975. Shortly thereafter, a stockholder derivative suit was started. Covington represented the company in that action. At the same time the Internal Revenue Service Intelligence Division began an investigation to determine whether any crimes had been committed in connection with the treatment of questionable payments on the company's tax reports for the years 1970 through 1974. Covington gave legal advice to the company concerning this potential litigation. In December 1976, after receiving legal advice, the company filed a second 8-K form with the SEC, revealing that questionable payments had been made in twenty-one foreign countries in aggregate amounting to $1,806,000.
 
 
 11
 While they were engaged in this investigation, Covington and the general counsel developed the questionnaire which was sent to various employees throughout the world to inquire concerning the existence of "questionable payments". Covington, with general counsel, also interviewed twenty-five employees and conducted additional interviews in two foreign countries with other employees, totalling thirty-nine employees in all. Representatives from Covington, as well as general counsel, made notes during the interviews and incorporated the notes in memoranda. It is claimed that interspersed in these notes are the mental impressions and opinions of the attorneys. The Board also authorized counsel to retain Price Waterhouse "to aid in the investigation." (Opinion A 173). All the employees are alleged to have been instructed directly to answer the questions. The information received was treated confidentially although it is not clear from the record that the employees were in each case told that the matter would be confidential from the Government.
 
 
 12
 In September 1977, after the filing of the 8-K in December 1976, a grand jury was convened in the Southern District to determine the existence of possible violations of the customs laws, mail fraud and conspiracy. In August 1978, the IRS referred its own investigation to the Department of Justice, and the grand jury began considering possible criminal violations of the Internal Revenue Code. Although certain senior employees retained their own counsel in the investigation, Kostelanetz and Ritholz ("Kostelanetz"), retained to represent the company, also began to appear with certain middle-level employees with whom the Government requested interviews.
 
 
 13
 By December 1978 fourteen employees represented by Kostelanetz had been interviewed by the U.S. Attorney's office. Each was advised of his privilege under the Fifth Amendment but responded to questioning, nevertheless. It became apparent to Kostelanetz, however, that these employees and others like them might be subject to some criminal exposure and might be well advised to claim the privilege against self-incrimination. Counsel informed the U.S. Attorney that if "participatory" witnesses were not granted immunity the firm would recommend that such individuals seek separate counsel who could give them an independent judgment on whether they should testify if they were not granted immunity. The U.S. Attorney's office asserted that it was in no position to determine who should be granted immunity. Instead it caused the issuance of the grand jury subpoena now involved, contending that the documents requested were needed in order to make an informed decision on the question of immunity. The documents sought relate separately to the two intra-corporate inquiries mentioned above and are described in Judge Pierce's opinion, quoted above. The subpoena was addressed, perhaps not insignificantly, to "General Counsel (John Doe) Drug, Inc.", rather than to the corporation itself.
 
 
 14
 The appellant general counsel and the corporation contend that the documents requested come within the attorney-client privilege of the corporation and are, in any event, the work-product of the general counsel and cooperating attorneys.
 
 
 15
 Judge Pierce held that the rule to be employed with respect to the attorney-client privilege as applied to corporate employees was the so-called "control group" test. City of Philadelphia v. Westinghouse Electric Corp., 210 F.Supp. 483 (E.D.Pa.), Mandamus and prohibition denied sub nom. General Electric Co. v. Kirkpatrick, 312 F.2d 742 (3d Cir. 1962), Cert. denied, 372 U.S. 943, 83 S.Ct. 937, 9 L.Ed.2d 969 (1963). Under this test, only communications from those officers or employees who would participate in the policy-making that would result from legal advice to the corporation come within the attorney-client privilege. Judge Pierce also held that the attorneys' work-product protection is not absolute and that the Government had shown that there is sufficient necessity under the circumstances to justify the grand jury subpoena of the work product here.
 
 
 16
 Appellants contend (1) that the attorney-client privilege for the corporation should not depend on whether the corporate employee was in a position to determine corporate policy on the basis of the legal advice obtained; and (2) in any event, that the material gathered from the employees is absolutely protected work product of the attorneys or, alternatively, that the Government has not shown necessity for the production in this case.
 
 
 17
 Rule 26 of the Federal Rules of Civil Procedure obviously does not apply to grand jury subpoenas and Rule 16 of the Federal Rules of Criminal Procedure posits a pre-trial proceeding in which there is a known defendant. See United States v. Nobles, 422 U.S. 225, 234-35, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). It is now clear, however, that discovery by the Government in grand jury proceedings is subject to the attorney-client privilege as developed at common law, United States v. Mackey, 405 F.Supp. 854, 857 (E.D.N.Y.1975) (Weinstein, J.); In re Stolar, 397 F.Supp. 520, 523 (S.D.N.Y.1975) (Pierce, J.), as well as to the work-product rule, In re Grand Jury Proceedings (Duffy), 473 F.2d 840 (8th Cir. 1973); See United States v. Nobles, supra, 422 U.S. at 236, 95 S.Ct. 2160. A grand jury investigation is in some respects similar to pre-trial discovery. Nobles,supra, 422 U.S. at 247 n.6, 95 S.Ct. 2160 (White, J., concurring) (distinguishing such an investigation from a criminal Trial ).[4] The Federal Rules of Evidence now specifically make reference to rules of privilege in grand jury proceedings. Rule 1101(c) declares that the "rule with respect to privileges applies at all stages of all actions, cases, and proceedings," and Rule 1101(d) states:
 
 
 18
 "The rules (other than with respect to privileges) do not apply in the following situations:
 
 
 19
 "(2) Grand Jury. Proceedings before grand juries."
 
 
 20
 Thus, the attorney-client privilege, as a true "privilege," is applicable to grand jury subpoenas. And even if the work-product rule is not strictly a "privilege," as applied to interviews with non-party witnesses, the rule has been applied to grand jury proceedings. In re Terkeltoub, 256 F.Supp. 683 (S.D.N.Y.1966); Matter of Rosenbaum, 401 F.Supp. 807, 808 (S.D.N.Y.1975); United States v. Mitchell, 372 F.Supp. 1239 (S.D.N.Y.), Appeal dismissed sub nom. Stans v. Gagliardi, 485 F.2d 1290 (2d Cir. 1973). The Eighth Circuit, in the corporate context, has applied the work-product doctrine to an attorney's refusal to answer questions before the grand jury about interviews he had with persons who were not employees of his corporate client. In re Grand Jury Proceedings (Duffy), supra; see also In re Grand Jury Investigation (Sturgis), 412 F.Supp. 943 (E.D.Pa.1976) (sustaining an attorney's claim of work-product protection even though his corporate client had waived the attorney-client privilege).
 
 
 21
 When we apply the attorney-client privilege to attorneys for a corporate client, the question naturally arises as to which employees come within the corporation's privilege and, if so, why. The question is one of first impression in this circuit, and has occasioned a split in authority elsewhere. The narrower test the "control group" standard was adopted by the trial judge below and has already been described. See Natta v. Hogan, 392 F.2d 686, 692 (10th Cir. 1968). The broader test is the scope of employment rule. See Harper & Row Pub., Inc. v. Decker, 423 F.2d 487, 491-92 (7th Cir. 1970), Aff'd by an equally divided Court, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971). A somewhat circumscribed version of the scope of employment standard was articulated by the Eighth Circuit in Diversified Industries, Inc. v. Meredith, 572 F.2d 596, 609-10 (1978) (en banc), making the privilege applicable to an employee's communication
 
 
 22
 "if (1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents. We note, moreover, that the corporation has the burden of showing that the communication in issue meets all of the above requirements."
 
 
 23
 Id. at 609; Accord, 2 Weinstein's Evidence P 503(b)(04). Appellants here urge that we adhere to the Diversified test.
 
 
 24
 When we apply the work-product rule, however, the issue is not whether a particular employee comes within the ambit of the attorney-client privilege, but whether the communication to the corporate attorney by the employee is in furtherance of the attorney's duty to investigate the facts in order to advise the corporate client in anticipation of litigation.
 
 
 25
 So far as the corporate attorney-client privilege is concerned, the privilege is unqualified, so that if the communication to corporate counsel is made by an employee found to be within the privilege, it is not discoverable. See Radiant Burners, Inc. v. American Gas Ass'n, 320 F.2d 314, 324 (7th Cir.) (en banc), Cert. denied, 375 U.S. 929, 84 S.Ct. 330, 11 L.Ed.2d 262 (1963). If made by an employee who, for one reason or another, is not held to be within the corporate privilege, the communication is like that of a non-employee witness and can only be protected from discovery by the work-product rule. See Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). To the extent that an internal corporate investigation is made by management itself, there is no attorney-client privilege, See United States v. United Shoe Machinery Corp., 89 F.Supp. 357, 358 (D.Mass.1950); Cf. Valente v. Pepsico, Inc., 68 F.R.D. 361, 367 (D.Del.1975) (no privilege for house counsel who is engaged in giving Business advice), and by the same token, no work-product protection, See Nobles, supra, 422 U.S. at 238-39 & n.13, 95 S.Ct. 2160 (work product applies to attorney and agents working on his behalf in anticipation of litigation).
 
 
 26
 The first inquiry must be to determine separately for each of the two investigations mentioned, whether the inquiries come within the scope of the attorney-client corporate privilege or within the work-product rule. We agree with Judge Jack B. Weinstein in Weinstein's Evidence, P 503(b)(04), at 503-45, that in claiming the protection of the attorney-client privilege "(t)he corporation has the burden of showing that the communication was made for the purpose of securing Legal advice, i. e., that it was made in contemplation of future professional action by the attorney." In the corporate context a similar burden falls upon the corporation when we assess whether the communication sought is the work-product of an attorney.
 
 
 27
 We do not view the first investigation by management as coming within the attorney-client privilege or the work-product rule. We think that the second investigation by Covington does trigger the attorney-client privilege, but we do not need to decide which employees' communications fall within the scope of the Privilege, for we can adequately decide this appeal under the work-product rule, as did the Supreme Court in Hickman v. Taylor,supra, without formulating the scope of the privilege based upon the particular status of corporate employees. And cf. Radiant Burners, Inc. v. American Gas Ass'n, supra, 320 F.2d at 323-24.
 
 
 28
 The Audit Committee itself described the first investigation, which was conducted primarily by non-lawyer senior officials, as "the investigation begun By management in November, 1975," (emphasis added) and the District Court stated that "(a) preliminary investigation was conducted by John Doe's management, the results of which induced its board of directors to authorize a broader investigation by its Audit Committee." (A 173). The purpose of the first investigation seems to have been to discover facts for a report to the Audit Committee of the Board of Directors in the regular course of business. The first 8-K form was dated March 9, 1976 after Covington had commenced its own (the second) investigation and had recommended the filing. The second 8-K form was dated December 27, 1976 after that investigation had been concluded.
 
 
 29
 Though the record in this type of proceeding is necessarily sparse, we cannot conclude that appellants have carried their burden of establishing that the first investigation by management was professional activity by the corporation's general counsel, with non-attorney senior officials simply acting as the agents of attorneys. We think that the Audit Committee's own characterization of the first investigation as one by "management," while not conclusive, is closer to the fact than any other characterization now advanced. Participation of the general counsel does not automatically cloak the investigation with legal garb. Compare Valente v. Pepsico, Inc., supra.
 
 
 30
 While employees who perform numerous functions in the business world will have occasion to seek competent legal advice, it is true, nonetheless, that management will often try to find the facts on its own, preliminary to a determination of whether to seek legal advice or simply in order to formulate business policy. That seems to us the posture of management's first investigation.
 
 
 31
 When the extent and magnitude of the revelations on these subjects were discovered, the advice of counsel was sought. The subsequent second investigation was for the purpose of determining whether to file 8-Ks and in how much detail, whether to file amended tax returns, and the vulnerability generally of the corporation and its personnel to criminal and civil sanctions. Having crossed the threshold of requiring legal advice for the Board of Directors, the next step was to afford counsel the means to discover the true state of facts. It was surely with a view to getting a basis for its legal advice that Covington formulated and dispatched the "questionable payments" questionnaire to seventy-one employees all over the world. It was upon these responses that the attorneys would rely in constructing their legal advice. The responses were forthcoming after the employees questioned were instructed to cooperate.
 
 
 32
 The replies to the questionnaire led to thirty-nine interviews with corporate employees, principally engaged in the international division or in subsidiaries operating abroad. In the questionnaire and in interviews, questions were asked concerning "political contributions, payments to government officials, unrecorded assets and transactions not properly reflected on the books of the Corporation." (A 75). Notes were taken at the interviews and later reduced to memoranda by the attorneys. The representation was made to the District Court that the "notes were not read back to the witness at the time and were not signed by the witness, nor was the memorandum (made after the interview) read back to the witness, or approved by the witness." (A 140).
 
 
 33
 Having put aside the difficult question of which echelon of employee comes within the corporate attorney-client privilege, but having determined that Covington was acting as counsel in preparing for possible litigation during the second investigation,[5] we pass directly to the claim that the items produced during this second investigation and sought by the subpoena are protected by the work-product doctrine.
 
 
 34
 In Hickman v. Taylor, supra, the Supreme Court considered the work product of a lawyer in the context of the new Federal Rules of Civil Procedure, after refusing to define the scope of the attorney-client privilege in the federal courts. Petitioner "sought discovery as of right of oral and written statements of witnesses whose identity is well known and whose availability to petitioner appears unimpaired." 329 U.S. at 508, 67 S.Ct. at 392. The Court upheld the validity of a "work product of the lawyer" rule in the circumstances. It left open in civil discovery whether production might be justified where the witnesses "are no longer available or can be reached only with difficulty." Id. at 511, 67 S.Ct. at 394. But while the Court recognized that there might be adequate reasons to justify production of written statements if the burden were sustained by one who would invade the privacy of the attorney, 329 U.S. at 512, 67 S.Ct. 385, it considered differently Oral statements made by witnesses to the attorney. The Court said:
 
 
 35
 "But as to oral statements made by witnesses to (the attorney) . . ., whether presently in the form of his mental impressions or memoranda, we do not believe that any showing of necessity can be made under the circumstances of this case so as to justify production. Under ordinary conditions, forcing an attorney to repeat or write out all that witnesses have told him and to deliver the account to his adversary gives rise to grave dangers of inaccuracy and untrustworthiness. No legitimate purpose is served by such production. The practice forces the attorney to testify as to what he remembers or what he saw fit to write down regarding witnesses' remarks. Such testimony could not qualify as evidence; and to use it for impeachment or corroborative purposes would make the attorney much less an officer of the court and much more an ordinary witness. The standards of the profession would thereby suffer."
 
 
 36
 329 U.S. at 512-13, 67 S.Ct. at 394.
 
 
 37
 On this basis, a distinction might be drawn between the written answers to the questionnaires set out in the employees' own words and the notes and memoranda based upon oral interviews. However, we do not doubt that each is part of the lawyer's work product, and, absent a showing of necessity, in differing degrees, is privileged.
 
 
 38
 The Government claims an overriding necessity to see the work product here on the asserted ground that it cannot otherwise determine on which witnesses to confer immunity. Since we conclude that the argument of necessity is not strong enough to prevail in this case, we need not differentiate here between the written reply to a questionnaire and an oral statement, though we are not unmindful that it has been held that oral statements may not be discoverable by a grand jury on any showing of good cause. In re Grand Jury Proceedings (Duffy), supra, 473 F.2d at 848.
 
 
 39
 We think the claim of necessity made by the government insufficient for several reasons. First, the appellants have apparently furnished to the U.S. Attorney all the non-work product materials thus far requested. Second, appellants have furnished the names and geographical areas of each of the employees to whom the questionnaire was sent. (A 113-14).
 
 
 40
 Third, according to the affidavit of an SEC financial analyst, the Commission staff has already been provided with "specific details to supplement the general descriptions in the Form 8-K. Thus, they (Covington) identified specific countries in which payments had been made, named (John Doe) personnel who had been involved in particular payments and (John Doe) personnel who had been aware of the payments, and revealed the amounts and purposes of particular payments." (A 45).
 
 
 41
 Fourth, the affidavit of Assistant U.S. Attorney Diskant confirms that "(e) vidence has been developed demonstrating that high (John Doe) officials within the international group knew about and approved the payments and the concealment devices." (A 49).
 
 
 42
 There has been no demonstrable lack of cooperation with the U.S. Attorney's office. The argument that the work product is needed to make decisions on immunity grants is farfetched. To the extent that the statements by employees are confessions of their own culpability, they would simply confirm, if immunity should be granted, that it was granted to a guilty person. To the extent that the replies are not inculpatory of the individual, it is unlikely that he would need a grant of immunity to make him give testimony. Already fourteen employees have been interviewed by the U.S. Attorney without claiming privilege, and two have testified in the grand jury.
 
 
 43
 To avoid a concerted claim of the privilege against self-incrimination by all prospective witnesses which might impede the investigation, the Kostelanetz firm agreed to suggest to individual employees that they seek independent counsel to advise them. This puts the Government in the same position regarding immunity grants in which it normally finds itself. We do not believe that searching an attorney's legitimate work product is necessary to the normal bargaining to which a prosecutor resorts in recommending immunity. In our adversary system, without regard to Fifth and Sixth Amendment constitutional considerations, which in the light of our decision we need not reach in this case, the prosecution is not entitled to be served on a silver platter. The duty of each man to give evidence in a criminal investigation is always limited by his personal privilege against self-incrimination. So long as he does not act simply to protect others and so long as he is free to make his own choice with independent legal advice, the Government has neither cause for complaint nor a proper claim of necessity to override the protection of a lawyer's work product.
 
 
 44
 Turning finally to documents covered by demands for production numbered 4 and 5 in the subpoena, the "summaries and reports" and accountants' workpapers, these defy blanket categorization by an appellate court.
 
 
 45
 To the extent that "all summaries and reports" represent work product, they are protected, as we have said, by the work-product doctrine. To the extent that the accountants' workpapers reflect oral conversations with corporate employees after the retainer of Covington, these, too, qualify as work product. As for the rest, the District Court should determine whether particular workpapers were prepared under the direction of the general counsel "to aid in the (second) investigation," in the language of the District Court in which case the papers can qualify as work product. Any other accountants' worksheets would not be protected.
 
 
 46
 The District Court should peruse borderline documents to determine whether they come within the protection of the work-product doctrine.
 
 
 47
 The contempt citation is reversed. The U.S. Attorney may, of course, serve a new subpoena that is consistent with this opinion.
 
 
 
 *
 The Honorable Jack R. Miller, Associate Judge, U.S. Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 Pursuant to the request of the United States and the appellants, the identity of the appellant corporation is not disclosed and the papers, including the briefs, are sealed accordingly
 
 
 [2]
 This decision has been handed down expeditiously taking precedence over appeals earlier argued. It is not technically within the thirty-day provision of 28 U.S.C. § 1826(b) since the decision is made more than thirty days after the filing of the notice of appeal. Indeed, notice of appeal was filed on April 9, 1979, and the case was argued on May 3, twenty-five days later (only five days short of the thirty-day limit). We do not believe, however, that there is any jurisdictional lack, particularly since the contempt resulted in a fine rather than confinement. The § 1826(b) limitation has been held by a sister circuit not to be jurisdictional. Melickian v. United States, 547 F.2d 416, 417-19 (8th Cir.), Cert. denied, 430 U.S. 986, 97 S.Ct. 1684, 52 L.Ed.2d 381 (1977). And we agree. As the Eighth Circuit noted with respect to the congressional intent, "there was general agreement that the provision would protect the meritorious appellant-contemnor from extended incarceration" a consideration not applicable here
 
 
 [3]
 "The Government states that it only seeks to learn the 'facts' surrounding the foreign payments in issue and is not interested in the mental impressions of John Doe's attorneys. To the extent that the subpoenaed documents contain non-factual material, the government proposes that petitioner be permitted to redact such information subject to the supervision and approval of the Court." (A 175 n.1)
 
 
 [4]
 Mr. Justice White observed that "the injury to the factfinding process is far greater where a rule keeps Evidence from the factfinder than when it simply keeps advance disclosure of evidence from a party or keeps him from Leads to evidence developed by his adversary and which he is just as well able to find by himself." Id. at 247-48, 95 S.Ct. at 2174-2175 (emphasis in original)
 
 
 [5]
 At the Board meeting on December 3, 1976 (A 105-107), a special committee was appointed, subsequent to the receipt of legal advice, to determine what action the corporation should pursue with respect to, Inter alia, "whether or not the Corporation should pursue litigation against any one or more of the present or former directors, officers, or employees of the Corporation. . . ."