Gants, Ralph D., J.
The plaintiffs, Marcia and Harold Rhodes, both individually and on behalf of their daughter, Rebecca Rhodes (collectively, “the Rhodes”), have moved to compel the defendants — AIG Domestic Claims, Inc. (“AIG”), National Union Fire Insurance Company of Pittsburgh, PA (“National Union”), and Zurich American Insurance Company (“Zurich”) — to produce various documents that have been withheld based on various claims of privilege. After hearing, the Rhodes’ motion to compel is ALLOWED IN PART AND DENIED IN PART.
BACKGROUND
This case has a long and complex history, which is necessary to understand in order to resolve this motion. On January 9, 2002, Marcia Rhodes was paralyzed from the waist down when the car she was driving was rear-ended by a tractor-trailer truck driven by Carol Zalewski (“Zalewski”). Zalewski at the time was an employee of a company called Driver Logistics. The truck was owned by Penske Truck Leasing Corporation (“Penske”) and was leased to Building Materials Corporation of America d/b/a GAF Materials Corporation (“GAF”).
In July 2002, the plaintiffs brought suit against Zalewski, Driver Logistics, Penske, and GAF. Zurich had issued a $2 million primary automobile liability policy to GAF, and assumed the costs of defending the claim. National Union had provided GAF excess insurance above Zurich’s $2 million primary layer of insurance. The other defendants were also insured under the Zurich and National Union policies issued to GAF. The following entities participated in the defense of the claim:
Crawford & Company (“Crawford”) was the third-party administrator that Zurich retained to oversee and monitor the tort claim and the ensuing litigation;
McCarter & English, LLP (“McCarter & English”) was GAF’s general counsel and participated in that capacity in defending the claim;
Nixon, Peabody, LLP (“Nixon Peabody”) was retained to represent GAF specifically in this tort claim. Its fees were paid by Zurich under the GAF policy;
AIG was the third-party administrator that National Union retained to oversee and monitor the tort claim and the ensuing litigation;
Campbell, Campbell, Edwards & Conroy (“the Campbell firm”) was retained by AIG on behalf of National Union to collaborate with McCarter & English and Nixon Peabody in defending GAF;
Sloan & Walsh was also retained by represent GAF;
Morrison, Mahoney & Miller was retained to represent Zalewski and Driver Logistics; and
*493 Corrigan, Johnson & Tutor was retained to represent Penske.
Despite the extensive medical costs the Rhodes were incurring and the strong evidence of permanent injuiy, Zurich did not offer its $2 million policy to the plaintiffs until March 2004, and made that offer contingent on the release of all the plaintiffs’ claims against all the defendants. The offer was rejected. At the trial in September 2004, the defendants admitted to liability and contested only the amount of damages. The jury awarded the plaintiffs $9,400,000 in damages, not including the pre-judgment interest, which added another $2.5 million. The plaintiffs then brought the instant action, which alleges that Zurich, National Union, and AIG violated Mass. G.L.c. 93A and c. 176D in failing to act reasonably and in good faith in handling the plaintiffs’ tort claim.
The plaintiffs have sought various documents in discovery which the defendants have refused to provide, invoking various privileges. The plaintiffs have moved to compel the defendants to produce some of these documents, contending that the privilege claimed either does not exist under Massachusetts law or does not apply to the documents for which it is claimed.[1] In view of the number of documents at issue, this Court will divide the documents into various categories and consider whether each category of documents is privileged or must be produced.
DISCUSSION
Category 1: Internal Correspondence of the Third-Party Administrators Crawford and AIG Created Before Litigation Was Threatened or Commenced
The third-party administrators — Crawford and AIG — each contend that internal memoranda and correspondence[2] regarding the plaintiffs’ insurance claims that were prepared after the accident but before the litigation commenced is protected from disclosure under Mass.R.Civ.P. 26(b)(3) (“the Rule”) because they were prepared in anticipation of litigation. This Rule provides in pertinent part: Mass.R.Civ.P. 26(b)(3). The Rule effectively incorporates into Massachusetts law the work product doctrine first articulated by the United States Supreme Court in Hickman v. Taylor, which sought to protect from disclosure certain information regarding an attorney’s preparation of a client’s case. 329 U.S. 495, 510-11 (1947). The information protected includes information an attorney or her agent assembles in anticipation of litigation as well as her mental impressions, conclusions, opinions, legal theories or trial strategy. Id.; see Fed.R.Civ.P. 26(b). Such information is technically not privileged, but is generally protected from discovery. See Messelman v. Phillips, 176 F.R.D. 194, 195 n.1 (D.Md. 1997).
[A] party may obtain discovery of documents . . . otherwise discoverable under subdivision (b)(1) of this rule[3] and prepared in anticipation of litigation or for trial by or for another party or for that other party’s representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.
The Rule distinguishes between what has become known as ordinary or fact work product versus opinion work product. Fact work product is protected from disclosure, but to a lesser degree than opinion work product — it may be ordered produced upon a showing that the opposing party has substantial need for the fact work product and cannot without undue hardship obtain the substantial equivalent. See Mass.R.Civ.P. 26(b)(3) and Reporter’s Notes. Opinion work product is protected from disclosure “except in extremely unusual circumstances.” Reporter’s Notes, Mass.R.Civ.P. 26(b)(3). The greater protection given to opinion work product includes not only the attorney’s mental impressions or “intellectual work-product” but also that of “investigators and claim-agents.” Reporter’s Notes, Mass.R.Civ.P. 26(b)(3), quoting 48 F.R.D. 500, 502 (1970).
Although the language of the Rule protects from disclosure the work product prepared both by a party and that party’s representative (generally, her attorney and the agents of her attorney), that protection applies only to work product prepared “in anticipation of litigation or for trial.” Mass.R.Civ.P. 26(b)(3). When the work product is prepared in “the ordinary line of business and duty, looking to the gathering and beneficial use of information,” it does not enjoy any protection under the Rule even if “such reports might ultimately be useful to one or another party in case of future litigation.” Shotwell v. Winthrop Comm. Hosp., 26 Mass.App.Ct. 1014, 1016 (1988). Thus, in Shotwell, when the plaintiff injured herself by walking into a glass panel in a hospital doorway, incident reports prepared by the hospital were not found to be protected work product, even though there plainly was the risk of a lawsuit once the incident had occurred. Id. at 1014-15. “(T]he mere possibility that a certain event could potentially lead to future litigation does not render all documents subsequently prepared with regard to that event privileged . . . The essential question is what was the primary motivating purpose behind the creation of a particular document.” Harris v. Steinberg, 6 Mass. L. Rptr. 417, 1997 WL 89164 (Mass.Super. Feb. 10, 1997) (Doerfer, J.). In other words, “[t]he pertinent test is: whether in light of the *494 nature of the document and factual situation in the particular case the document can fairly be said to have been prepared or obtained because of the prospect of litigation.” Colonial Gas Co. v. Aetna Cas. & Sur. Co., 144 F.R.D. 600, 605 (D.Mass. 1992).
Under G.L.c. 176D, §3, it is an “unfair or deceptive act or practice in the business of insurance” to engage in an “unfair claim settlement practice,” one of which is to fail “to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.” G.L.c. 176D, §3. It is also an “unfair claim settlement practice” to refuse to pay an insurance claim “without conducting a reasonable investigation based upon all available information.” G.L.c. 176D, §3. Therefore, an insurance company has a legal duly under Massachusetts law promptly and reasonably to investigate an insurance claim. This duty under Massachusetts law is owed both to its insured and to the person injured. See Clegg v. Butler, 424 Mass. 413, 418 (1997) (“we cannot accept Utica’s argument that only insureds are owed a duly of fair dealing when it comes to an insurer’s settlement practices”). Since the insurer has such a-duly with eveiy claim, regardless of the risk of litigation arising from that claim, its factual investigation of that claim is performed in “the ordinary line of business and duty,” notin anticipation of litigation. See Shotwell, 26 Mass.App.Ct. at 1016. Indeed, even if the insured had guaranteed the insurer that she would not litigate the claim, the insurance company would still retain its duty reasonably to investigate the claim. Consequently, to the extent the insurer’s claims file contains any factual reports of investigation of the claim, such reports must be disclosed in discovery because they do not enjoy any work product protection.
Similarly, at least until litigation has been threatened or commenced, the evaluation of the facts by claim investigators and claim agents is also performed in “the ordinary line of business and duty,” not in anticipation of litigation. See id. Such evaluations of the facts are not protected, even if they would otherwise be characterized as opinion work product, because they become work product under the Rule only when they are prepared in anticipation of litigation. Here, where the plaintiffs are bringing a claim under Chapter 93A that the defendant insurers willfully failed “to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear,” in violation of G.L.c. 176D, §3, there can be no question that the insurer’s evaluation of the facts is relevant and either admissible or likely to lead to admissible evidence. See Mass.R.Civ.P. 26(b)(1).
Therefore, this Court finds that, until litigation has been threatened or commenced, the factual reports of investigation and the insurer’s evaluation of those reports contained in the claims file are prepared in “the ordinary line of business and duty” and not in anticipation of litigation, and thereby do not constitute protected work product.
The defendants may contend that the logical consequence of this decision is that any part of the insurance claims file prepared before litigation was threatened or initiated would be discoverable by any party in litigation, even the plaintiffs in the underlying tort case. This is true only as to the factual reports of investigation contained in the claims file, not as to the claims representative’s evaluation of the facts developed during the investigation. The insurer’s evaluation of the facts would not be discoverable by the plaintiffs in the underlying tort litigation because the evaluation would not be admissible nor likely to lead to admissible evidence. In the underlying tort litigation, the insured, not the insurance company, is the defendant, and the insurance company’s evaluation of the strength of the plaintiffs’ case would not be admissible into evidence as a statement of a party opponent and would not be likely to lead to admissible evidence. In contrast, here, the insurance companies themselves are the defendants and their evaluation of the strength of the plaintiffs’ case is a central issue in determining the reasonableness and good faith of their settlement offers. Indeed, this difference in the scope of discovery is one of the key reasons why trial courts generally sever the Chapter 93A/176D claims brought by a plaintiff against a defendant’s insurance company from the tort claims brought against the insured defendant.
As to the factual reports of investigation, under Mass.R.Civ.P. 26(b)(3), the defendant’s insurer stands in the same shoes as the defendant itself — the documents protected by that Rule are those “prepared in anticipation of litigation ... by or for another party or by or for that other party’s representative (including his attorney, . . . insurer, or agent).” Mass.R.Civ.P. 26(b)(3) (emphasis added). If a corporation were to direct its quality control department to conduct an internal investigation of an accident caused by product failure or its personnel office to investigate a sexual harassment complaint, the documents generated by that investigation would be discoverable in a subsequent litigation, since Massachusetts does not recognize any internal investigation privilege apart from the statutory privilege granted to hospitals to conduct internal peer investigations of alleged medical errors. See Carr v. Howard, 426 Mass. 514, 517-18 (1998) (“Massachusetts provided no common law privilege for materials submitted to or produced by a medical peer review committee”); McGuire v. Acuflex Microsurgical, Inc., 175 F.R.D. 149, 155-56 & n.8 (D.Mass. 1997) (Gertner, J.) (employers’ internal investigations into allegations of sexual harassment “are not privileged”); Harris-Lewis v. Mudge, 9 Mass. L. Rptr. 573, 1999 WL 98589 (Mass.Super. Feb. 18, 1999) (Fremont-Smith, J.) (Massachusetts does not recognize a common law privilege for an organization’s internal investigations, sometimes characterized as the self-critical analysis *495 privilege). See also In re Grand Jury Subpoena, 599 F.2d 504, 510 (2d Cir. 1979) (“To the extent that an internal corporate investigation is made by management itself, there is no attorney-client privilege”). Compare with G.L.c. 11, §204 (medical peer review privilege).[4] If the corporation wished to protect the documents generated by the internal Investigation from disclosure in discoveiy, it would need to direct its attorney to conduct an internal investigation for the purpose of providing legal advice to the company regarding the accident, and have the internal investigation conducted under the direction of that attorney. See In re Grand Jury Investigation, 437 Mass. 340, 351 (2002) (“A construction of the attorney-client privilege that would leave internal investigations wide open to third-parly invasion would effectively penalize an institution for attempting to conform its operations to legal requirements by seeking the advice of knowledgeable and informed counsel”). If the documents generated by a corporation’s own internal investigation would not be protected from disclosure unless the investigation were conducted by an attorney for the purpose of providing legal advice, then the documents generated by an investigation conducted by the corporation’s representative, specifically its insurer, also would not be protected from disclosure unless the investigation were conducted by an attorney for the purpose of providing legal advice.
This Court rejects the defendants’ contention that litigation is anticipated as to every claim from the moment the claim is reported by the insured. This proposition would essentially require this Court to ignore the controlling precedent of the Appeals Court in Shotwell because there, too, there was a risk of litigation once the hospital learned that a visitor was injured by walking into a glass panel. If the mere possibility of litigation is sufficient to provide work product protection to any internal investigation of an incident, whether by the insured or the insurance company, then Shotwell must be overruled and an implicit internal investigation privilege will effectively have been created.
Pragmatically, in cases such as this alleging unfair claim settlement practices in violation of Chapters 176D and 93A, factual reports of investigation would still be ordered disclosed even if they were deemed to have been prepared in anticipation of the underlying litigation. The essence of an unfair settlement claim is that the insurance company knew or should have known that liability was reasonably clear and yet failed to make a reasonable offer of settlement. The plaintiffs cannot reasonably be expected to prove such a claim without access to the information possessed by the claims representative responsible for the settlement offer, because the plaintiffs must prove that, in view of that information, the insurer should have made a more generous offer of settlement than it did. As one federal court aptly described it:
Bad-faith actions against an insurer . . . can only be proved by showing exactly how the company processed the claim, how thoroughly it was considered and why the company took the action it did. The claims file is a unique, contemporaneously prepared history of the company’s handling of the claim; in an action such as this the need for the information in the file is not only substantial, but overwhelming . . . The “substantial equivalent” of this material cannot be obtained through other means of discoveiy. The claims file “diary" is not only likely to lead to evidence, but to be very important evidence on the issue of whether [the insurer] acted reasonably.
Yurick v. Liberty Mutual Ins. Co., 201 F.R.D. 465, 473, n.13 (D.Ariz. 2001). Consequently, in all but the rarest cases (and certainly in this case) the plaintiffs would have a substantial need for the fact work product and could not obtain the substantial equivalent from other sources. See Mass.R.Civ.P. 26(b)(3).
Category 2: Internal Correspondence of the Third-Party Administrators Crawford and AIG Created After Litigation Was Threatened or Commenced
Once litigation has been threatened or commenced, the factual reports of investigation and the internal reports evaluating the strength of the litigation become work product that falls within the rubric of Mass.R.Civ.P. 26(b)(3), because such documents, from that moment in time forward, are now deemed to have been prepared in anticipation of litigation.
As discussed earlier, in an unfair claim settlement case, factual reports of investigation in the claims file would still be discoverable, because the plaintiff would have substantial need for the fact work product known to the insurance company representative responsible for the settlement offer and could not obtain the substantial equivalent from other sources.
Opinion work product, however, is generally not discoverable, because Mass.R.Civ.P. 26(b)(3) requires the Court to protect from disclosure “the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.” Mass.RCiv.P. 26(b)(3). As stated earlier, the Reporter’s Notes reflect that this Rule was specifically intended to protect the “mental impressions and subjective evaluations of investigators and claim-agents,” as well as attorneys. Reporter’s Notes, Mass.RCiv.P. 26, quoting 48 F.R.D. 500, 502 (1970). However, as also stated earlier, the Reporter’s Notes also make clear that opinion work product is not always protected, and may be ordered disclosed “in extremely unusual circumstances.” Reporter’s Notes, Mass.RCiv.P. 26.
In Ward v. Peabody, the Supreme Judicial Court identified at least one unusual circumstance in which opinion work product could be ordered disclosed, *496 declaring that “in the singular instances ‘when the activities of counsel are inquired into because they are at issue in the action before the Court, there is cause for production of documents that deal with such activities, though they are work product.’ ” 380 Mass. 805, 818 (1980), quoting 4 J. Moore, Federal Practice par. 26.62(4) at 26-447 (2d ed. 1979). See also Holmgren v. State Farm Mutual Auto. Ins. Co., 976 F.2d 573, 577 (9th Cir. 1992) (“opinion work product may be discovered and admitted when mental impressions are at issue in a case and the need for the material is compelling”) (emphasis in original). In an unfair claim settlement case such as this, the conduct of the insurance claims representatives who were responsible for deciding what settlement offer to tender to the plaintiffs is “at issue” because the reasonableness of the settlement offer tendered by the insurance company is the focus of the case. Moreover, the need for the opinion work product of the insurance claims representatives in such cases is compelling, because the plaintiffs cannot reasonably prove that the defendant insurance companies willfully failed “to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear,” in violation of G.L.c. 176D, §3, without showing that the insurance claim representatives recognized during the underlying litigation that liability was clear and the injuries severe, and yet still failed to present a prompt and fair settlement offer. See Holmgren, 976 F.2d at 577 (“In a bad faith insurance claim settlement case, the ‘strategy, mental impressions and opinion of [the insurer’s] agents concerning the handling of the claim are directly at issue’ ” and the plaintiffs need for the documents “was compelling”), quoting Reavis v. Metropolitan Property & Liability Ins. Co., 117 F.R.D. 160, 164 (S.D. Cal. 1987). See also Hartman v. Banks, 164 F.R.D. 167, 170 (E.D. Pa. 1995) (“The claims file is a unique, contemporaneously prepared history of the company’s handling of the claim; in an action such as this [bad faith] the need for the information in the file is not only substantial but overwhelming,” quoting Brown v. Superior Court, 670 P.2d 725, 734 (Ariz. 1983)).
The need for disclosure of the opinion work product in the insurance claims file becomes clear when one considers that the plaintiffs are certainly entitled to depose the claims representative responsible for determining the settlement offer and ask him to explain his reasons for making that offer. He could not refuse to answer questions asking him to explain his thought process by invoking any privilege or by denying its relevancy because his state of mind is protected by no privilege, and his good faith and that of his employer is plainly relevant in an unfair claim settlement case. If his opinion work product in the claims file were not discoverable, the plaintiffs would be denied access to any writings he made prior to or contemporaneously with the settlement offer that may contradict or influence his deposition and trial testimony. It would make no sense for the law to allow the plaintiffs to ask the claims representative today what he was thinking in 2004 when the settlement offers were made but deny the plaintiff access to the writings he made in 2004 that reflect what he was thinking at that time. It would also be fundamentally unfair to the plaintiffs, because it would permit the claims representative to testify about his state of mind without needing to worry about being impeached with the prior statements he made in the claims file. See Silva v. Fire Ins. Exchange, 112 F.R.D. at 699, 699-700 (D.Mont. 1986) (“[t]he timeworn claims of work product and attorney-client privilege cannot be invoked to the insurance company’s benefit where the only issue in the case is whether the company breached its duty of good faith in processing the insured’s claim”).
In contrast, the plaintiffs would not be permitted to depose the insurance company attorney to ask him his reasons for advising his client to make the settlement offer, because the attorney’s state of mind is not at issue — the settlement offer is made by the client, and merely communicated by its attorney — and any advice the attorney provided to the insurance company would be protected by the attorney-client privilege. Consequently, since the attorney could not be asked his opinions at deposition or trial, the attorney’s opinion work product would be entitled to equivalent protection. However, if the insurance company sought to present an advice of counsel defense, then it would need to waive its attorney-client privilege as to that advice, and the attorney could then be deposed regarding his advice. See Darius v. Boston, 433 Mass. 274, 277-78 n.7 (2001), citing United States v. Bilzerian, 926 F.2d 1285, 1291-94 (2d Cir. 1991). By waiving the attorney-client privilege as to that advice, the company and its attorney would also be waiving the protection of the opinion work product doctrine, and would need to produce documents written by the attorney regarding that advice that may differ from his deposition testimony. See Micron Separations, Inc. v. Pall Corp., 159 F.R.D. 361, 365 (D.Mass. 1995) (when advice of counsel is asserted as defense, attorney is ordered to disclose any opinion work product that contradicts or casts doubt on his opinion letter). In short, regardless of whether the opinion work product was created by the insurance claims representative or an attorney, opinion work product is discoverable if its creator must answer questions at deposition or trial about his mental impressions, conclusions, or legal theories, and is not discoverable if its creator lawfully can refuse to answer such questions.
Therefore, in view of the allegations of this unfair claim settlement case, this Court finds that the opinion work product created by insurance company claims representatives who participated in determining the timing or the amount of the settlement offers made to the plaintiffs in the underlying case is discoverable because the conduct of these claims represen *497 tatives is at issue and the need for such work product is compelling.
Category 3: Correspondence Between and Among the Parties and their Attorneys
The attorney client privilege protects communications made between the client and the attorney for the purpose of obtaining legal advice. Upjohn v. United States, 449 U.S. 383, 389 (1981); Matter of John Doe Grand Jury Investigation, 408 Mass. 480, 481-82 (1990). The privilege “extends to all communications made to an attorney or counselor” by a person looking to “obtain his advice and opinion in matters of law, in relation to his legal rights, duties, and obligations.” Hatton v. Robinson, 14 Pick. 416, 421 (Mass. 1833).
Although the attorney-client privilege is extensive, the privilege is deemed waived as to the information disclosed when a communication is disclosed to a third party. AMCA Int’l Corp. v. Phipard, 107 F.R.D. 39, 40-44 (D.Mass. 1985). There is an exception to that waiver, however, carved out for situations in which the third parly to whom disclosure was made possessed a common legal interest with the client. “Properly understood, the joint defense or common interest doctrine is a device designed to prevent waiver of the attorney-client privilege when discrete parties face the same legal claim.” Am. Auto. Ins. Co. v. J.P. Noonan Transp., 12 Mass. L. Rptr. 493, 496, 2000 WL 33171004 at *6 (Mass.Super.Ct. Feb. 2001) (McHugh, J.), citing Chahoon v. Commonwealth, 62 Va. (21 Gratt.) 1036 (1871). The common-interest doctrine applies “[w]hen two or more clients consult or retain an attorney on particular matters of common interest” as well as to “communications made by the client or the client’s lawyer to a lawyer representing another in a matter of common interest.” Ken’s Foods, Inc. v. Ken’s Steak House, Inc., 213 F.R.D. 89, 93 (D.Mass. 2002), citing 3 Weinstein’s Federal Evidence §§503.21[1] & 503.12(2] (internal quotations omitted). Further,
the privilege allows attorneys facing a common litigation opponent [to] exchange privileged communications and attorney work product in order to prepare a common defense without waiving either privilege.
Id. (internal citations and quotations omitted). In order for the privilege to apply,
the party asserting the privilege must show that (1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived.
Id., citing United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20, 28 (1st Cir. 1989).
In the lone Superior Court case to consider the subject in this context, cited above, Judge James McHugh (now of the Appeals Court) determined that an “essential ingredient” of the doctrine is the “common pursuit of a common legal enterprise.” Am. Auto. Ins. Co., 2000 WL 33171004 at *6. Judge McHugh continued:
The common interest doctrine . . . has both a theoretical and a practical component. In theoiy, the parties among whom privileged matter is shared must have a common legal, as opposed to commercial, interest. In practice, they must have demonstrated cooperation in formulating a common legal strategy.
Id. at *6, citing Bank of Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 447 (S.D.N.Y. 1995).
Although no appellate court has yet ruled on this issue, this Court finds that Massachusetts law recognizes the existence of the joint defense privilege when the three elements described above have been satisfied. Having so ruled, this Court must now apply the joint defense privilege to the documents sought in this case. Before doing that, however, it is important to distinguish between the joint defense privilege, which permits the attorneys for Party A to discuss privilege communications with the attorneys for Party B without waiving the attorney-client privilege or work product protection, from the attorney-client privilege that protects the communications of an attorney jointly representing two parties.
Here, Nixon Peabody, having been retained by Zurich to represent GAF, with its legal fees paid by Zurich, jointly represented both GAF and Zurich, as well as Zurich’s agent — Crawford. Similarly, the Campbell firm, having been retained by National Union to represent GAF, with its legal fees paid by National Union, jointly represented both GAF and National Union, as well as National Union’s agent— AIG. See McCourt Co., Inc. v. FPCProperties, Inc., 386 Mass. 145, 146 (1982) (law firm retained by the insurer to represent its insured “is attorney for the insured as well as the insurer”); Imperiali v. Pica, 338 Mass. 494, 499 (1959) (“[A]n attorney undertaking the defense of the case covered by the policy is an attorney for both the insurer and the insured and owes to each a duty of good faith and diligence in the discharge of his duties”); MBA Ethics Opinion No. 77-16 (1977) (“When an attorney is retained by a casualty insurance company to represent an insured, the attorney is in fact representing not only the insurance company’s interest in defeating the plaintiffs litigation, but also is representing the insured"). When an attorney, as here, jointly represents two clients, she does not waive the attorney-client privilege by sharing privileged communications made by one client with the other client. Federal Deposit Ins. Corp. v. Ogden Corp., 202 F.3d 454, 461 (1st Cir. 2000). Consequently, Nixon Peabody did not waive any attorney-client privilege or work product protection by sharing confidential *498 information with Zurich or Crawford which it had obtained from GAF. Similarly, the Campbell firm did not waive any attorney-client privilege or work product protection by sharing confidential information with National Union or AIG which it had obtained from GAF.
The joint defense privilege applies when different law firms represent different clients who share common interests and choose to work as a team to further those interests. Those interests need not be identical; such a requirement would essentially deprive most clients of the benefit of joint defense agreements because the interests of different clients are rarely precisely identical. Am. Auto Ins. Co., 2000 WL 33171004 at *8 (“It is highly unlikely that any common or joint defense, at least in matters of some complexity, can proceed without some adjustment of differing interests. Indeed, joint consultations are likely to deal quite often with methods for adjusting those differing interests while maintaining a common front against the common opponent”). It is sufficient that the clients share a common interest, even while retaining interests that may be separate and distinct from each other.
The consequence of a joint defense agreement is to permit privileged communications to be exchanged with other attorneys and clients without waiving the attorney-client privilege. Therefore, if Zurich and National Union shared a common interest and their attorneys entered into a joint defense agreement, Zurich’s attorneys could discuss with National Union’s attorneys their privileged communications with Zurich without waiving Zurich’s attorney-client privilege. A joint defense agreement, therefore, preserves an attorney-client privilege that would otherwise be waived as a result of the communication to a non-client. It cannot, however, create an attorney-client privilege when none existed. Therefore, since communications directly between National Union and Zurich were never privileged, they cannot become privileged by virtue of the joint defense privilege. Such communications would be privileged only if they were made to their respective counsel and then shared by counsel with the other attorneys or their clients. In short, direct communications between or among various clients do not become privileged by the joint defense privilege; rather, privileged communications with counsel that are transmitted by counsel to joint defense counsel or their clients simply remain privileged through the joint defense privilege.
There exists no talismanic method by which parties must prove that a common interest exists so as to eliminate the waiver otherwise effected by a third-party disclosure. A joint defense agreement requires there to be an agreement among the various attorneys and clients, but, as with most other agreements, it need not be made or memorialized in writing. A joint defense agreement may be made orally or its existence may be inferred by the conduct of the parties. See Ken’s Foods, 213 F.R.D. at 93 (“While a written agreement is not a prerequisite for invoking the common interest doctrine, parties seeking to invoke the exception must establish that they agreed to engage in a joint effort and to keep the shared information confidential from outsiders”).[5] In the context of this case, this Court finds that the defendants in the underlying tort litigation implicitly entered into a joint defense agreement regarding the plaintiffs’ claim against them. While their interests varied to some extent, all shared an interest in obtaining a reasonable settlement of the plaintiffs’ claims and, if settlement efforts failed, in limiting the amount of damages that the plaintiffs would win at trial.
The plaintiffs contend that Zurich no longer shared the common interest with National Union necessary for a joint defense agreement when it tendered its $2 million policy to the plaintiffs, since Zurich’s interest following its tender was to settle the litigation immediately in order to minimize its payment of defense costs. This argument, however, fails for at least three reasons. First, since the plaintiffs rejected Zurich’s settlement offer and proceeded to trial, Zurich continued to share a common interest with National Union in minimizing the plaintiffs’ damage award at trial. Second, even after tendering its policy, Zurich still retained its obligations to its insured — GAF—to pay the legal fees incurred by Nixon Peabody — GAF’s attorney — in defense of the tort litigation and to act reasonably to resolve the claim against GAF. Since Zurich and National Union each continued to owe a duty to their insured, GAF, they continued to share this common interest even after Zurich’s tender of its policy. See First State Ins. Co. v. Utica Mut. Ins. Co., 870 F.Sup. 1168, 1175 (D.Mass. 1994). Third, since Zurich was required to continue to pay Nixon Peabody’s legal fees even after the tender, Nixon Peabody continued to represent both GAF and Zurich. GAF certainly shared with National Union an interest in limiting the amount of the damage award. Pragmatically, since GAF and National Union plainly shared a common interest after Zurich tendered its policy, and since Nixon Peabody jointly represented GAF and Zurich, it would be impracticable to find that Zurich was no longer part of the joint defense, since it would mean that Nixon Peabody would be barred from sharing joint defense documents with one of its clients (Zurich) without thereby waiving the privilege enjoyed by another client (GAF).
Consequently, with respect to the document requests made by the plaintiffs, this Court finds that:
1. privileged communications shared by counsel with clients they jointly defended remain privileged;
2. privileged communications exchanged by the defense attorneys with other defense attorneys and *499 defendant clients remained privileged as a result of the joint defense privilege; but
3. communications directly between or among the defendants that were never protected by the attorney-client privilege or work product doctrine do not become privileged or protected as a result of the joint defense privilege.
Category 4: Communications Among the Defendants and GAF’s Insurance Broker, Willis Corroon
The defendants have withheld ten communications among the defendants and defense counsel that were contemporaneously copied to GAF’s insurance broker, Willis Corroon. This Court finds that the disclosure of these otherwise privileged communications to Willis Corroon waived the defendants’ privilege with respect to these documents.
The provision of a privileged document to a person who is neither a client nor an attorney waives the privilege as to that document unless that person is either:
1. retained by the attorney to assist her in providing legal advice, such as when an accountant or a consultant is retained to assist the attorney in understanding complex financial or technical matters. See Cavallaro v. United States, 284 F.3d 236, 247 (1st Cir. 2002) (“third parties employed to assist a lawyer in rendering legal advice” were included within the privilege accorded communications between attorney and client); or
2. “necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit.” Id. at 247, citing United States v. Kovel 296 F.2d 918 (2d Cir. 1961). “(T]he ‘necessity’ element means more than just useful and convenient. The involvement of the third party must be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications.” Id. at 249.
Here, the defendant insurance companies do not contend that GAF’s broker was retained by any defense attorney to assist in providing legal advice. Nor is there any evidence in the record that the broker was necessaiy or even highly useful to permit the attorneys effectively to consult with their clients. Indeed, given the nature of the underlying tort case, it is not at all clear what possible assistance the broker could have provided to counsel in defending the claim. Since the defendants are unable to establish that Willis Corroon either was retained by any defense attorney or necessaiy to facilitate attorney-client communications, any otherwise privileged communication that was copied to Willis Coroon must be disclosed to the plaintiffs because the privilege has been waived.
Category 5: Documents Regarding the Reserve Amounts Set for the Underlying Tort Case
The defendants have withheld from production those documents (or portions of documents) that declare the amount of reserves the insurance companies set aside during the underlying tort litigation to assure their ability to satisfy those claims. The setting of a reserve amount, in part, reflects an evaluation by the insurance company as to the strength of the claim and the amount of likely damages, since the insurer “must reasonably estimate the amount necessaiy to provide for the payment of all losses and claims for which the insurer may be liable.” Silva v. Basin Western, Inc., 47 P.3d 1184, 1189 (Colo. 2002); citing Lipton, Inc. v. Superior Court, 56 Cal.Rptr.2d 341, 350 (Cal.Ct.App. 1996). Consequently, when the reserve is set during or in anticipation of litigation, it falls within the rubric of opinion work product, which must be disclosed within the parameters discussed earlier in this decision.
To the extent that the defendants are contending that reserve information may never be disclosed, even within those parameters, because the information is not relevant, this Court rejects that contention. Even if the reserve amount were to be found by the trial judge not to be admissible into evidence, it would still be relevant to the case and reasonably likely to lead to the discovery of admissible evidence, since the plaintiffs would be permitted to explore in deposition with the person establishing the reserve limit the reasons for setting that amount.
Category 6; Claims Manuals
Some of the insurance defendants have withheld from discovery the written policies and procedures for processing personal injury and motor vehicle claims that were in effect during the underlying tort litigation, including any pertinent claims manuals.
AIG contends that its claims manuals are not discoverable because they are not relevant. This is plainly wrong because the plaintiffs are entitled to investigate whether AIG and National Union complied with their own written policies in handling this claim in determining whether they acted in good faith.
Zurich agreed to produce Crawford’s liability claims handling guidelines, entitled “Liability Standards of Excellence,” but has refused to provide its own claims handling guidelines, entitled “Liability Best Practices,” arguing that these guidelines are irrelevant because Crawford administered the underlying tort claims against GAF on behalf of Zurich and never saw Zurich’s guidelines. This Court does not agree. While Crawford was responsible for the day-to-day administration of these claims, Zurich’s Major Case Unit provided general oversight of these claims and Zurich retained the exclusive authority to settle or otherwise resolve these claims. It would certainly be relevant to the plaintiffs’ unfair claim settlement case if Zurich *500 permitted Crawford, acting as its agent, to administer this claim in a manner inconsistent with the guidelines that Zurich required of itself when it directly handled comparable claims.
Consequently, this Court orders the disclosure by AIG and Zurich of their withheld claims manuals and claim handling guidelines.
ORDER
For the reasons detailed above, this Court ORDERS as follows:
1. Until litigation has been threatened or commenced, the factual reports of investigation and the insurer’s evaluation of the claim contained in the defendants’ claims file are prepared in “the ordinary line of business and duty” and not in anticipation of litigation, and thereby do not constitute protected work product.
2. Fact work product in Category 2 must be disclosed in discovery, because the plaintiffs have substantial need for the fact work product known to the insurance company representative responsible for the settlement offer and could not obtain the substantial equivalent from other sources.
3. The opinion work product in Categoiy 2 created by insurance company claims representatives who participated in determining the timing or the amount of the settlement offers made to the plaintiffs must be disclosed in discovery because the conduct of these claims representatives is at issue and the need for such work product is compelling.
4. Privileged communications shared by a defense attorney with clients he jointly defended remain privileged.
5. Privileged communications exchanged by the defense attorneys with other defense attorneys and defendant clients remain privileged as a result of the joint defense privilege.
6. Communications directly between or among the defendants that were never protected by the attorney-client privilege or work product doctrine do not become privileged or protected as a result of the joint defense privilege.
7. The defendants shall forthwith disclose to the plaintiffs any otherwise privileged communication that was copied to Willis Coroon, because the privilege has been waived.
8. The Reserve Amount shall be treated as relevant opinion work product and must be disclosed within the parameters set forth in this decision.
9. The defendants AIG and Zurich shall forthwith disclose to the plaintiffs their withheld claims manuals and claims handling guidelines.
10. The plaintiffs’ motion to recover the attorneys fees they incurred in bringing these motions is DENIED.
11.This Court trusts that the parties will be able to resolve the specifics of their discovery dispute through application of the principles set forth in this Memorandum and Order, and that this Court will not need to sort out how this decision applies to each of the dozens of document requests at issue. If there is any ambiguity in this decision or other reason why the parties need the Court to resolve specific matters, the parties shall promptly bring those differences to the attention of the Court.

 The plaintiffs do not contest the invocation of the attorney-client privilege or the attorney work product doctrine with respect to correspondence between each defendant and the attorneys representing them in this unfair settlement action. Nor do they seek privileged communications between AIG and the Campbell firm, or between AIG and its coverage counsel, Harwood Lloyd.

 Memoranda and correspondence are deemed internal if they were maintained internally within each firm and not disseminated outside the firm.

 Mass.R.Civ.P. 26(b)(1) provides that documents are discoverable, if not privileged, when they are: (1) “relevant to the subject matter involved in the pending action,” and (2) either admissible at trial or “reasonably calculated to lead to the discovery of admissible evidence.” Mass.R.Civ.P. 26(b)(1).

 G.L.c. Ill, §204(a) provides that “the proceedings, reports and records of a medical peer review committee shall be confidential and ... not be subject to subpoena or discovery, or introduced into evidence in any judicial or administrative proceeding, except proceedings held by the boards of registration in medicine, social work, or psychology or by the department of public health pursuant to Chapter 111C . . .” Under G.L.c. Ill, §205(b), :‘[i]nformation and records which are necessary to comply with risk management and quality assurance programs established by the board of registration in medicine and which are necessary to the work product of medical peer review committees, including incident reports required to be furnished to the board of registration in medicine . . . , shall be deemed to be proceedings, reports or records of a medical peer review committee.”

 The Court in Ken’s Foods cited the following cases in support of this proposition with the following parentheticals summarizing the courts’ holdings:
See, e.g., United States v. Schwimmer, 892 F.2d 237, 243-44 (2d Cir. 1989) (finding valid joint defense privilege where information was “imparted in confidence” between parties “who had agreed upon and undertaken a joint strategy”); United States v. Sawyer, 878 F.Sup. 295, 297 (D.Mass. 1995) (despite similar interests between employer and employee, insufficient evidence that communications were made during the course of a joint defense effort; proponent could neither establish time frame of agreement nor acts creating and/or terminating the agreement); United States v. United Tech. Corp., 979 F.Sup. 108, 110, 112 (D.Conn. 1997) (holding common interest doctrine shielded information consortium members shared pursuant to collaboration agreement); Libbey Glass, Inc. v. Oneida, Ltd., 197 F.R.D. 342, 349 (N.D. Ohio 1999) (stating burden is on proponent to “have taken effective steps to ensure that all participants were aware of the need to maintain confidentiality, and to show that mechanisms were in place to accomplish that objective before the information was shared”).
213 F.R.D. at 93.